# CUYLER, CORRECTIONAL SUPERINTENDENT, ET AL. *v.* SULLIVAN

No. 78–1832.  Argued February 20, 1980—Decided May 12, 1980

Powell, J., delivered the opinion of the Court, in which Burger, C. J., Stewart, White, Blackmun, Rehnquist, and Stevens, JJ., joined, in Part III of which Brennan, J., joined, and in Parts I, II, and III of which Marshall, J., joined. Brennan, J., filed an opinion concurring in part and concurring in the result, *post*, p. 350. Marshall, J., filed an opinion concurring in part and dissenting in part, *post*, p. 354.

*Steven H. Goldblatt* argued the cause for petitioners. With him on the brief were *Michael F. Henry* and *Marianne E. Cox.*

*Marilyn J. Gelb* argued the cause and filed a brief for respondent.

MR. JUSTICE POWELL delivered the opinion of the Court.

The question presented is whether a state prisoner may obtain a federal writ of habeas corpus by showing that his retained defense counsel represented potentially conflicting interests.

I

Respondent John Sullivan was indicted with Gregory Carchidi and Anthony DiPasquale for the first-degree murders of John Gorey and Rita Janda. The victims, a labor official and his companion, were shot to death in Gorey's second-story office at the Philadelphia headquarters of Teamsters' Local 107. Francis McGrath, a janitor, saw the three defendants in the building just before the shooting. They appeared to be awaiting someone, and they encouraged McGrath to do his work on another day. McGrath ignored their suggestions. Shortly afterward, Gorey arrived and went to his office. McGrath then heard what sounded like firecrackers exploding in rapid succession. Carchidi, who was in the room where McGrath was working, abruptly directed McGrath to leave the building and to say nothing. McGrath hastily complied. When he returned to the building about 15 minutes later, the defendants were gone. The victims' bodies were discovered the next morning.

Two privately retained lawyers, G. Fred DiBona and A. Charles Peruto, represented all three defendants throughout the state proceedings that followed the indictment. Sullivan had different counsel at the medical examiner's inquest, but he thereafter accepted representation from the two lawyers retained by his codefendants because he could not afford to pay his own lawyer.[1] At no time did Sullivan or his lawyers

---

[1] DiBona and Peruto were paid in part with funds raised by friends of the three defendants. The record does not disclose the source of the balance of their fee, but no part of the money came from either Sullivan or his family. See *United States ex rel. Sullivan* v. *Cuyler*, 593 F. 2d 512, 518, and n. 7 (CA3 1979).

object to the multiple representation. Sullivan was the first defendant to come to trial. The evidence against him was entirely circumstantial, consisting primarily of McGrath's testimony. At the close of the Commonwealth's case, the defense rested without presenting any evidence. The jury found Sullivan guilty and fixed his penalty at life imprisonment. Sullivan's post-trial motions failed, and the Pennsylvania Supreme Court affirmed his conviction by an equally divided vote. *Commonwealth* v. *Sullivan,* 446 Pa. 419, 286 A. 2d 898 (1971).[2] Sullivan's codefendants, Carchidi and DiPasquale, were acquitted at separate trials.

Sullivan then petitioned for collateral relief under the Pennsylvania Post Conviction Hearing Act, Pa. Stat. Ann., Tit. 19, § 1180–1 *et seq.* (Purdon Supp. 1979–1980). He alleged, among other claims, that he had been denied effective assistance of counsel because his defense lawyers represented conflicting interests. In five days of hearings, the Court of Common Pleas heard evidence from Sullivan, Carchidi, Sullivan's lawyers, and the judge who presided at Sullivan's trial.

DiBona and Peruto had different recollections of their roles at the trials of the three defendants. DiBona testified that he and Peruto had been "associate counsel" at each trial. App. 32a. Peruto recalled that he had been chief counsel for Carchidi and DePasquale, but that he merely had assisted DiBona in Sullivan's trial. DiBona and Peruto also gave conflicting accounts of the decision to rest Sullivan's defense. DiBona said he had encouraged Sullivan to testify even though the Commonwealth had presented a very weak case. Peruto remembered that he had not "want[ed] the defense to go on because I thought we would only be exposing

---

[2] The Pennsylvania Supreme Court denied two petitions for reargument. See *Commonwealth* v. *Sullivan,* 472 Pa. 129, 180, 371 A. 2d 468, 492 (1977) (Pomeroy, J., concurring and dissenting). Meanwhile, Sullivan's *pro se* petitions for federal habeas corpus relief were dismissed for failure to exhaust state remedies. See *United States ex rel. Sullivan* v. *Cuyler, supra,* at 515, and n. 4.

the [defense] witnesses for the other two trials that were coming up." *Id.*, at 57a. Sullivan testified that he had deferred to his lawyers' decision not to present evidence for the defense. But other testimony suggested that Sullivan preferred not to take the stand because cross-examination might have disclosed an extramarital affair. Finally, Carchidi claimed he would have appeared at Sullivan's trial to rebut McGrath's testimony about Carchidi's statement at the time of the murders.

The Court of Common Pleas held that Sullivan could take a second direct appeal because counsel had not assisted him adequately in his first appeal. App. to Pet. for Cert. 5F. The court did not pass directly on the claim that defense counsel had a conflict of interest, but it found that counsel fully advised Sullivan about his decision not to testify. *Id.*, at 7F. All other claims for collateral relief were rejected or reserved for consideration in the new appeal.

The Pennsylvania Supreme Court affirmed both Sullivan's original conviction and the denial of collateral relief. *Commonwealth* v. *Sullivan*, 472 Pa. 129, 371 A. 2d 468 (1977). The court saw no basis for Sullivan's claim that he had been denied effective assistance of counsel at trial. It found that Peruto merely assisted DiBona in the Sullivan trial and that DiBona merely assisted Peruto in the trials of the other two defendants. Thus, the court concluded, there was "no dual representation in the true sense of the term." *Id.*, at 161, 371 A. 2d, at 483. The court also found that resting the defense was a reasonable tactic which had not denied Sullivan the effective assistance of counsel. *Id.*, at 162, 371 A. 2d, at 483–484.

Having exhausted his state remedies, Sullivan sought habeas corpus relief in the United States District Court for the Eastern District of Pennsylvania. The petition was referred to a Magistrate, who found that Sullivan's defense counsel had represented conflicting interests. The District Court, however, accepted the Pennsylvania Supreme Court's conclusion

that there had been no multiple representation. The court also found that, assuming there had been multiple representation, the evidence adduced in the state postconviction proceeding revealed no conflict of interest. App. to Pet. for Cert. 5C–8C.

The Court of Appeals for the Third Circuit reversed. *United States ex rel. Sullivan* v. *Cuyler,* 593 F. 2d 512 (1979). It first held that the participation by DiBona and Peruto in the trials of Sullivan and his codefendants established, as a matter of law, that both lawyers had represented all three defendants. The court recognized that multiple representation " 'is not tantamount to the denial of effective assistance of counsel. . . .' " But it held that a criminal defendant is entitled to reversal of his conviction whenever he makes " 'some showing of a possible conflict of interest or prejudice, however remote. . . .' " *Id.,* at 519, quoting *Walker* v. *United States,* 422 F. 2d 374, 375 (CA3) (*per curiam*), cert. denied, 399 U. S. 915 (1970). See also *United States ex rel. Hart* v. *Davenport,* 478 F. 2d 203, 210 (CA3 1973). The court acknowledged that resting at the close of the prosecutor's case "would have been a legitimate tactical decision if made by independent counsel." [3] Nevertheless, the court thought that action alone raised a possibility of conflict sufficient to prove a violation of Sullivan's Sixth Amendment rights. The court found support for its conclusion in Peruto's admission that concern for Sullivan's codefendants had affected his judgment that Sullivan should not present a defense. To give weight to DiBona's contrary testimony, the court held, "would be to . . . require a showing of actual prejudice." 593 F. 2d, at 522.[4]

---

[3] Indeed, the Court of Appeals noted that the Pennsylvania Supreme Court at first divided evenly on whether the Commonwealth's evidence was sufficient to support a conviction. 593 F. 2d, at 521, n. 10.

[4] Judge Garth, with whom Judges Adams and Rosenn joined, filed an opinion dissenting from the denial of a petition for rehearing en banc. *Id.,* at 524.

We granted certiorari, 444 U. S. 823 (1979), to consider recurring issues left unresolved by *Holloway* v. *Arkansas,* 435 U. S. 475 (1978). We now vacate and remand.

## II

At the outset, we must consider whether the Court of Appeals exceeded the proper scope of review when it rejected the Pennsylvania Supreme Court's conclusion that DiBona and Peruto had not undertaken multiple representation. Petitioners claim that this determination by the Pennsylvania Supreme Court was a factfinding entitled to a presumption of correctness under 28 U. S. C. § 2254 (d).

Section 2254 (d) provides that "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction . . . [and] evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct" unless the applicant for a federal writ of habeas corpus can establish one of the enumerated causes for exception. The Pennsylvania Supreme Court's holding does not fall within this statute because it is a conclusion of law rather than a finding of fact.[5]

In *Townsend* v. *Sain,* 372 U. S. 293 (1963), the Court examined the distinction between law and fact as it applies on collateral review of a state conviction. The *Townsend* opinion, the precursor of § 2254 (d), noted that the phrase

---

[5] Petitioners must rely solely on the State Supreme Court's holding because the state court that heard evidence on Sullivan's petition for collateral relief did not decide whether defense counsel had represented conflicting interests. See *supra,* at 339. The State Supreme Court resolved that issue on the second direct appeal without the benefit of a trial court finding. Since we conclude that a determination of whether counsel undertook multiple representation is not a finding of fact, we need not decide whether the statements of an appellate court can be "determination[s] after a hearing on the merits of a factual issue" within the meaning of 28 U. S. C. § 2254 (d). Compare *Velleca* v. *Superintendent,* 523 F. 2d 1040, 1041–1042 (CA1 1975) (*per curiam*), with *Hill* v. *Nelson,* 466 F. 2d 1346, 1348 (CA9 1972) (*per curiam*).

"issues of fact" refers "to what are termed basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators. . . .'" 372 U. S., at 309, n. 6, quoting *Brown* v. *Allen*, 344 U. S. 443, 506 (1953) (opinion of Frankfurter, J.). Findings about the roles DiBona and Peruto played in the defenses of Sullivan and his codefendants are facts in this sense. But the holding that the lawyers who played those roles did not engage in multiple representation is a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case. Cf. *Brewer* v. *Williams*, 430 U. S. 387, 403–404 (1977); *Neil* v. *Biggers*, 409 U. S. 188, 193, n. 3 (1972). That holding is open to review on collateral attack in a federal court.

The Court of Appeals carefully recited the facts from which it concluded that DiBona and Peruto represented both Sullivan and his codefendants. The court noted that both lawyers prepared the defense in consultation with all three defendants, that both advised Sullivan on whether he should rest his defense, and that both played important roles at all three trials. 593 F. 2d, at 518–519. In fact, the transcript of Sullivan's trial shows that Peruto rather than DiBona rested the defense. App. 265a. We agree with the Court of Appeals that these facts establish the existence of multiple representation.

### III

We turn next to the claim that the alleged failings of Sullivan's retained counsel cannot provide the basis for a writ of habeas corpus because the conduct of retained counsel does not involve state action.[6] A state prisoner can win a federal

---

[6] Although the petitioners did not present this state action argument to the Court of Appeals, both parties have briefed and argued it in this Court. Since resolution of this question of law is a "predicate to an intelligent resolution" of the question on which we granted certiorari, see *Vance* v. *Terrazas*, 444 U. S. 252, 258–259, n. 5 (1980), we must address it. See *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foun-*

writ of habeas corpus only upon a showing that the State participated in the denial of a fundamental right protected by the Fourteenth Amendment. The right to counsel guaranteed by the Sixth Amendment is a fundamental right. *Argersinger* v. *Hamlin,* 407 U. S. 25, 29–33 (1972). In this case, Sullivan retained his own lawyers, but he now claims that a conflict of interest hampered their advocacy. He does not allege that state officials knew or should have known that his lawyers had a conflict of interest. Thus, we must decide whether the failure of retained counsel to provide adequate representation can render a trial so fundamentally unfair as to violate the Fourteenth Amendment.

This Court's decisions establish that a state criminal trial, a proceeding initiated and conducted by the State itself, is an action of the State within the meaning of the Fourteenth Amendment. See *Lisenba* v. *California,* 314 U. S. 219, 236–237 (1941); *Moore* v. *Dempsey,* 261 U. S. 86, 90–91 (1923). The Court recognized as much in *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), when it held that a defendant who must face felony charges in state court without the assistance of counsel guaranteed by the Sixth Amendment has been denied due process of law. Unless a defendant charged with a serious offense has counsel able to invoke the procedural and substantive safeguards that distinguish our system of justice, a serious risk of injustice infects the trial itself. *Id.,* at 344; see *Johnson* v. *Zerbst,* 304 U. S. 458, 467–468 (1938). When a State obtains a criminal conviction through such a trial, it is the State that unconstitutionally deprives the defendant of his liberty. See *Argersinger* v. *Hamlin, supra,* at 29–33.[7]

---

*dation,* 402 U. S. 313, 320, n. 6 (1971). See generally R. Stern & E. Gressman, Supreme Court Practice § 6.27, pp. 458–461 (5th ed. 1978).

[7] See generally *Fitzgerald* v. *Estelle,* 505 F. 2d 1334, 1345–1346 (CA5 1974) (en banc) (Godbold, J., concurring in part and dissenting in part), cert. denied, 422 U. S. 1011 (1975); *West* v. *Louisiana,* 478 F. 2d 1026, 1032–1034 (CA5 1973), vacated and remanded, 510 F. 2d 363 (1975) (en banc).

Our decisions make clear that inadequate assistance does not satisfy the Sixth Amendment right to counsel made applicable to the States through the Fourteenth Amendment. A guilty plea is open to attack on the ground that counsel did not provide the defendant with "reasonably competent advice." *McMann* v. *Richardson,* 397 U. S. 759, 770–771 (1970); see *Tollett* v. *Henderson,* 411 U. S. 258, 267 (1973). Furthermore, court procedures that restrict a lawyer's tactical decision to put the defendant on the stand unconstitutionally abridge the right to counsel. *Brooks* v. *Tennessee,* 406 U. S. 605, 612–613 (1972) (requiring defendant to be first defense witness); *Ferguson* v. *Georgia,* 365 U. S. 570, 593–596 (1961) (prohibiting direct examination of defendant). See also *Geders* v. *United States,* 425 U. S. 80 (1976); *Herring* v. *New York,* 422 U. S. 853 (1975). Thus, the Sixth Amendment does more than require the States to appoint counsel for indigent defendants. The right to counsel prevents the States from conducting trials at which persons who face incarceration must defend themselves without adequate legal assistance.

A proper respect for the Sixth Amendment disarms petitioner's contention that defendants who retain their own lawyers are entitled to less protection than defendants for whom the State appoints counsel. We may assume with confidence that most counsel, whether retained or appointed, will protect the rights of an accused. But experience teaches that, in some cases, retained counsel will not provide adequate representation. The vital guarantee of the Sixth Amendment would stand for little if the often uninformed decision to retain a particular lawyer could reduce or forfeit the defendant's entitlement to constitutional protection.[8] Since the State's conduct of a criminal trial itself implicates the State in the defendant's conviction, we see no basis for drawing a

---

[8] See Polur, Retained Counsel, Assigned Counsel: Why the Dichotomy?, 55 A. B. A. J. 254, 255 (1969).

distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers.[9]

## IV

We come at last to Sullivan's claim that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment because his lawyers had a conflict of interest. The claim raises two issues expressly reserved in *Holloway* v. *Arkansas*, 435 U. S., at 483-484. The first is whether a state trial judge must inquire into the propriety of multiple representation even though no party lodges an objection. The second is whether the mere possibility of a conflict of interest warrants the conclusion that the defendant was deprived of his right to counsel.

### A

In *Holloway,* a single public defender represented three defendants at the same trial. The trial court refused to consider the appointment of separate counsel despite the defense lawyer's timely and repeated assertions that the interests of his clients conflicted. This Court recognized that a lawyer forced to represent codefendants whose interests conflict cannot provide the adequate legal assistance required by the Sixth Amendment. *Id.,* at 481-482. Given the trial court's failure to respond to timely objections, however, the Court did not consider whether the alleged conflict actually existed. It simply held that the trial court's error unconstitutionally endangered the right to counsel. *Id.,* at 483-487.

---

[9] As the Court of Appeals for the Third Circuit said in *United States ex rel. Hart* v. *Davenport,* 478 F. 2d 203, 211 (1973):

"A rule which would apply one fourteenth amendment test to assigned counsel and another to retained counsel would produce the anomaly that the nonindigent, who must retain an attorney if he can afford one, would be entitled to less protection. . . . The effect upon the defendant—confinement as a result of an unfair state trial—is the same whether the inadequate attorney was assigned or retained."

*Holloway* requires state trial courts to investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case.[10] Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial.[11] Absent special circumstances,

---

[10] In certain cases, proposed Federal Rule of Criminal Procedure 44 (c) provides that the federal district courts "shall promptly inquire with respect to . . . joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation." See also ABA Project on Standards for Criminal Justice, Function of the Trial Judge § 3.4 (b) (App. Draft 1972).

Several Courts of Appeals already invoke their supervisory power to require similar inquiries. See *United States* v. *Waldman,* 579 F. 2d 649, 651–652 (CA1 1978); *United States* v. *DeBerry,* 487 F. 2d 448, 452–454 (CA2 1973); *United States* v. *Cox,* 580 F. 2d 317, 321 (CA8 1978), cert. denied, 439 U. S. 1075 (1979); *United States* v. *Lawriw,* 568 F. 2d 98 (CA8 1977), cert. denied, 435 U. S. 969 (1978); cf. *Ford* v. *United States,* 126 U. S. App. D. C. 346, 348–349, 379 F. 2d 123, 125–126 (1967). As our promulgation of Rule 44 (c) suggests, we view such an exercise of the supervisory power as a desirable practice. See generally Schwarzer, Dealing with Incompetent Counsel—The Trial Judge's Role, 93 Harv. L. Rev. 633, 653–654 (1980).

Although some Circuits have said explicitly that the Sixth Amendment does not require an inquiry into the possibility of conflicts, *United States* v. *Steele,* 576 F. 2d 111 (CA6) ( *per curiam*), cert. denied, 439 U. S. 928 (1978); *United States* v. *Mavrick,* 601 F. 2d 921, 929 (CA7 1979), a recent opinion in the Second Circuit held otherwise, *Colon* v. *Fogg,* 603 F. 2d 403, 407 (1979).

[11] ABA Code of Professional Responsibility, DR 5–105, EC 5–15 (1976); ABA Project on Standards for Criminal Justice, Defense Function § 3.5 (b) (App. Draft 1971).

Seventy percent of the public defender offices responding to a recent survey reported a strong policy against undertaking multiple representation in criminal cases. Forty-nine percent of the offices responding never undertake such representation. Lowenthal, Joint Representation in Criminal Cases: A Critical Appraisal, 64 Va. L. Rev. 939, 950, and n. 40 (1978). The private bar may be less alert to the importance of avoiding multiple

therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist.[12]    Indeed, as the Court noted in *Holloway, supra,* at 485–486, trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel.   "An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.' "   435 U. S., at 485, quoting *State* v. *Davis,* 110 Ariz. 29, 31, 514 P. 2d 1025, 1027 (1973).   Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.[13]

Nothing in the circumstances of this case indicates that the trial court had a duty to inquire whether there was a conflict of interest.   The provision of separate trials for Sullivan and his codefendants significantly reduced the potential for a divergence in their interests.   No participant in Sullivan's trial ever objected to the multiple representation. DiBona's opening argument for Sullivan outlined a defense compatible with the view that none of the defendants was connected with the murders.   See Brief for Respondent 7. The opening argument also suggested that counsel was not afraid to call witnesses whose testimony might be needed at the trials of Sullivan's codefendants.   See *id.,* at 8–9.   Finally, as the Court of Appeals noted, counsel's critical decision to

representation in criminal cases.   See Geer, Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney, 62 Minn. L. Rev. 119, 152–157 (1978); Lowenthal, *supra,* at 961–963.

[12] See *United States* v. *Kidding,* 560 F. 2d 1303, 1310 (CA7), cert. denied, 434 U. S. 872 (1977); *United States* v. *Mandell,* 525 F. 2d 671, 675–677 (CA7 1975), cert. denied, 423 U. S. 1049 (1976); Geer, *supra* n. 11, at 145–146.

[13] Cf. *United States* v. *Medel,* 592 F. 2d 1305, 1312–1313 (CA5 1979); *Foxworth* v. *Wainwright,* 516 F. 2d 1072, 1076–1077 (CA5 1975).

rest Sullivan's defense was on its face a reasonable tactical response to the weakness of the circumstantial evidence presented by the prosecutor. 593 F. 2d, at 521, and n. 10. On these facts, we conclude that the Sixth Amendment imposed upon the trial court no affirmative duty to inquire into the propriety of multiple representation.

## B

*Holloway* reaffirmed that multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest. See 435 U. S., at 482. Since a possible conflict inheres in almost every instance of multiple representation, a defendant who objects to multiple representation must have the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial. But unless the trial court fails to afford such an opportunity, a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel. Such a presumption would preclude multiple representation even in cases where " '[a] common defense . . . gives strength against a common attack.' " *Id.*, at 482–483, quoting *Glasser* v. *United States,* 315 U. S. 60, 92 (1942) (Frankfurter, J., dissenting).

In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.[14] In *Glasser* v. *United States,* for

---

[14] A substantial majority of the Courts of Appeals require defendants who contend that multiple representation violated their Sixth Amendment rights to identify an actual conflict of interest. See *United States* v. *Lovano,* 420 F. 2d 769, 773 (CA2), cert. denied, 397 U. S. 1071 (1970); *United States* v. *Atkinson,* 565 F. 2d 1283, 1284–1285 (CA4 1977), cert. denied, 436 U. S. 944 (1978); *Foxworth* v. *Wainwright, supra,* at 1077; *Thacker* v. *Bordenkircher,* 590 F. 2d 640, 642 (CA6), cert. denied, 442 U. S. 912 (1979); *United States* v. *Mandell, supra,* at 677–678; *United States* v. *Cox,* 580 F. 2d, at 321–323; *United States* v. *Kutas,* 542 F. 2d 527, 529 (CA9 1976), cert. denied, 429 U. S. 1073 (1977); cf. *United*

example, the record showed that defense counsel failed to cross-examine a prosecution witness whose testimony linked Glasser with the crime and failed to resist the presentation of arguably inadmissible evidence. *Id.,* at 72–75. The Court found that both omissions resulted from counsel's desire to diminish the jury's perception of a codefendant's guilt. Indeed, the evidence of counsel's "struggle to serve two masters [could not] seriously be doubted." *Id.,* at 75. Since this actual conflict of interest impaired Glasser's defense, the Court reversed his conviction.

*Dukes* v. *Warden,* 406 U. S. 250 (1972), presented a contrasting situation. Dukes pleaded guilty on the advice of two lawyers, one of whom also represented Dukes' codefendants on an unrelated charge. Dukes later learned that this lawyer had sought leniency for the codefendants by arguing that their cooperation with the police induced Dukes to plead guilty. Dukes argued in this Court that his lawyer's conflict of interest had infected his plea. We found " 'nothing in the record . . . which would indicate that the alleged conflict resulted in ineffective assistance of counsel and did in fact render the plea in question involuntary and unintelligent.' " *Id.,* at 256, quoting *Dukes* v. *Warden,* 161 Conn. 337, 344, 288 A. 2d 58, 62 (1971). Since Dukes did not identify an actual lapse in representation, we affirmed the denial of habeas corpus relief.

*Glasser* established that unconstitutional multiple representation is never harmless error. Once the Court concluded that Glasser's lawyer had an actual conflict of interest, it refused "to indulge in nice calculations as to the amount of prejudice" attributable to the conflict. The conflict itself demonstrated a denial of the "right to have the effective assistance of counsel." 315 U. S., at 76. Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prej-

States v. *Carrigan,* 543 F. 2d 1053, 1056 (CA2 1976) (burden of proof shifts when trial court fails to inquire into possibility of conflict).

udice in order to obtain relief. See *Holloway, supra,* at 487–491. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. See *Glasser, supra,* at 72–75.[15]

## C

The Court of Appeals granted Sullivan relief because he had shown that the multiple representation in this case involved a possible conflict of interest. We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance. Sullivan believes he should prevail even under this standard. He emphasizes Peruto's admission that the decision to rest Sullivan's defense reflected a reluctance to expose witnesses who later might have testified for the other defendants. The petitioner, on the other hand, points to DiBona's contrary testimony and to evidence that Sullivan himself wished to avoid taking the stand. Since the Court of Appeals did not weigh these conflicting contentions under the proper legal standard, its judgment is vacated and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE BRENNAN, concurring in Part III of the opinion of the Court and in the result.

I agree with the Court, in Part III, *ante,* at 342–345, that the alleged failure of retained counsel to render effective assistance involves state action and thus provides the basis for a writ of habeas corpus. I cannot, however, join Part IV of the opinion.

---

[15] See Comment, Conflict of Interests in Multiple Representation of Criminal Co-Defendants, 68 J. Crim. L. & C. 226, 231–232 (1977).

*Holloway* v. *Arkansas*, 435 U. S. 475 (1978), settled that the Sixth Amendment right to effective assistance of counsel encompasses the right to representation by an attorney who does not owe conflicting duties to other defendants. While *Holloway* also established that defendants usually have the right to share a lawyer if they so choose, that choice must always be knowing and intelligent. The trial judge, therefore, must play a positive role in ensuring that the choice was made intelligently. The court cannot delay until a defendant or an attorney raises a problem, for the Constitution also protects defendants whose attorneys fail to consider, or choose to ignore, potential conflict problems. "Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused. . . . The trial court should protect the right of an accused to have the assistance of counsel." *Glasser* v. *United States*, 315 U. S. 60, 71 (1942). "While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record." *Johnson* v. *Zerbst*, 304 U. S. 458, 465 (1938). This principle is honored only if the accused has the active protection of the trial court in assuring that no potential for divergence in interests threatens the adequacy of counsel's representation.

It is no imposition on a trial court to require it to find out whether attorneys are representing "two or more defendants [who] have been jointly charged . . . or have been joined for trial . . . ," to use the language of proposed Federal Rule of Criminal Procedure 44 (c).[1] It is probable as a practical

---

[1] Proposed Rule 44 (c) provides:

"Whenever two or more defendants have been jointly charged pursuant to Rule 8 (b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally

matter that virtually all instances of joint representation will appear from the face of the charging papers and the appearances filed by attorneys. The American Bar Association's standards under the ABA Project on Standards for Criminal Justice, Function of the Trial Judge § 3.4 (b) (App. Draft 1972), are framed on the premise that judges will be readily able to ascertain instances of joint representation.

"[A] possible conflict inheres in almost every instance of multiple representation." *Ante,* at 348. Therefore, upon discovery of joint representation, the duty of the trial court is to ensure that the defendants have not unwittingly given up their constitutional right to effective counsel. This is necessary since it is usually the case that defendants will not know what their rights are or how to raise them. This is surely true of the defendant who may not be receiving the effective assistance of counsel as a result of conflicting duties owed to other defendants. Therefore, the trial court cannot safely assume that silence indicates a knowledgeable choice to proceed jointly. The court must at least affirmatively advise the defendants that joint representation creates potential hazards which the defendants should consider before proceeding with the representation.[2]

---

advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel."

Congress has postponed the effectiveness of Rule 44 (c) until December 1, 1980, or until, and to the extent approved by, an Act of Congress, whichever is earlier. Pub. L. 92–42, 93 Stat. 326.

[2] Though proposed Rule 44 (c), n. 1, *supra,* provides a good model, the court's inquiry need not take any particular form. See also ABA Project on Standards for Criminal Justice, Function of the Trial Judge § 3.4 (b) (App. Draft 1972), which provides:

"Whenever two or more defendants who have been jointly charged, or whose cases have been consolidated, are represented by the same attorney,

Had the trial record in the present case shown that respondent made a knowing and intelligent choice of joint representation, I could accept the Court's standard for a postconviction determination as to whether respondent in fact was denied effective assistance. Where it is clear that a defendant has voluntarily chosen to proceed with joint representation, it is fair, if he later alleges ineffective assistance growing out of a conflict, to require that he demonstrate "that a conflict of interest actually affected the adequacy of his representation." *Ante,* at 349. Here, however, where there is no evidence that the court advised respondent about the potential for conflict or that respondent made a knowing and intelligent choice to forgo his right to separate counsel, I believe that respondent, who has shown a significant possibility of conflict,[3] is entitled to a presumption that his representation in fact suffered. Therefore, I would remand the case to allow the

---

the trial judge should inquire into potential conflicts which may jeopardize the right of each defendant to the fidelity of his counsel."

Several Courts of Appeals have imposed some kind of duty of inquiry. See *ante,* at 346, n. 10. One, the First Circuit, has suggested that at least the duty, as opposed to any specific form of inquiry, may be constitutionally mandated. *United States* v. *Waldman,* 579 F. 2d 649, 653 (1978).

[3] The Court of Appeals held that respondent successfully carried the burden of demonstrating "a possibility of prejudice or conflict of interest and that independent counsel might well have chosen a different trial strategy." *United States ex rel. Sullivan* v. *Cuyler,* 593 F. 2d 512, 521 (1979). The court based its holding, in part, on the testimony of one of respondent's two trial attorneys. He testified that they chose not to present a defense in respondent's case partly because they did not want to expose their defense before the upcoming trials of respondent's codefendants. Also, they did not want to risk having any evidence come out which, while exculpating respondent, might inculpate one of the codefendants. *Ibid.* The court credited this testimony. *Id.,* at 522.

The facts of this case demonstrate that, contrary to the view of the Court, *ante,* at 347, the provision of separate trials does not always reduce the potential for conflict. Here, in fact, "the potential for a divergence in [the codefendants'] interests," *ibid.,* arose, in part, precisely because there were separate trials.

petitioners an opportunity to rebut this presumption by demonstrating that respondent's representation was not actually affected by the possibility of conflict.

MR. JUSTICE MARSHALL, concurring in part and dissenting in part.

I agree that the Court of Appeals properly concluded that respondent's lawyers had undertaken multiple representation, and that a conviction obtained when a defendant's retained counsel provided ineffective assistance involves state action that may provide the basis for a writ of habeas corpus. Accordingly, I join Parts I, II, and III of the Court's opinion.

I believe, however, that the potential for conflict of interest in representing multiple defendants is "so grave," see ABA Project on Standards for Criminal Justice, Defense Function, Standard 4–3.5 (b) (App. Draft, 2d ed. 1979), that whenever two or more defendants are represented by the same attorney the trial judge must make a preliminary determination that the joint representation is the product of the defendants' informed choice. I therefore agree with MR. JUSTICE BRENNAN that the trial court has a duty to inquire whether there is multiple representation, to warn defendants of the possible risks of such representation, and to ascertain that the representation is the result of the defendants' informed choice.[1]

I dissent from the Court's formulation of the proper stand-

---

[1] The determination that the defendant has made an informed choice of counsel would not, of course, establish a waiver that would prevent him from subsequently raising any claim of ineffective assistance of counsel based on a conflict of interest. The dangers of infringing the defendants' privilege against self-incrimination and their right to maintain the confidentiality of the defense strategy foreclose the type of detailed inquiry necessary to establish a knowing and intelligent waiver. Furthermore, the inquiry would take place at such an early stage of the proceedings that not all possible conflicts might be anticipated. See Geer, Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney, 62 Minn. L. Rev. 119, 145 (1978).

ard for determining whether multiple representation has violated the defendant's right to the effective assistance of counsel. The Court holds that in the absence of an objection at trial, the defendant must show "that an actual conflict of interest adversely affected his lawyer's performance." *Ante,* at 348. If the Court's holding would require a defendant to demonstrate that his attorney's trial performance differed from what it would have been if the defendant had been the attorney's only client, I believe it is inconsistent with our previous cases. Such a test is not only unduly harsh, but incurably speculative as well. The appropriate question under the Sixth Amendment is whether an actual, relevant conflict of interests existed during the proceedings. If it did, the conviction must be reversed. Since such a conflict was present in this case, I would affirm the judgment of the Court of Appeals.[2]

Our cases make clear that every defendant has a constitutional right to "the assistance of an attorney unhindered by a conflict of interests." *Holloway* v. *Arkansas,* 435 U. S. 475, 483, n. 5 (1978). "[T]he 'assistance of counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." *Glasser* v. *United States,* 315 U. S. 60, 70 (1942). If "[t]he possibility of the inconsistent interests of [the clients] was brought home to the court" by means of an objection at trial, *id.,* at 71, the court may not require joint representation. But if no objection was made at trial, the appro-

---

[2] The Court of Appeals cast its decision in terms of a "potential for conflict of interest," *United States ex rel. Sullivan* v. *Cuyler,* 593 F. 2d 512, 522 (1979), and made no explicit statement that an actual conflict of interest existed. The court's analysis was premised, however, on its conclusion that "[w]e have no basis on which to reject Peruto's sworn admission that he injected improper considerations into the attorney-client relationship." *Ibid.* This statement clearly demonstrates that the court found an actual, relevant conflict of interests.

priate inquiry is whether a conflict actually existed during the course of the representation.

Because it is the simultaneous representation of conflicting interests against which the Sixth Amendment protects a defendant, he need go no further than to show the existence of an actual conflict.[3] An actual conflict of interests negates the unimpaired loyalty a defendant is constitutionally entitled to expect and receive from his attorney.

Moreover, a showing that an actual conflict adversely af-

---

[3] "Conflict of interests" is a term that is often used and seldom defined. The American Bar Association's usage, which has remained essentially unchanged since the promulgation of the Canons of Professional Ethics in 1908, is a fair statement of what is ordinarily meant by the term, and it is that meaning that I adopt here. The ABA Standards state that a lawyer should not undertake multiple representation "if the duty to one of the defendants may conflict with the duty to another." ABA Project on Standards for Criminal Justice, Defense Function, Standard 4-3.5 (b) (App. Draft, 2d ed. 1979). The Code of Professional Responsibility forbids multiple representation "if it would be likely to involve [the lawyer] in representing differing interests," unless the lawyer can adequately represent each client and obtains the informed consent of each. ABA Code of Professional Responsibility, Disciplinary Rule 5-105 (A)-(B) (1976). The Code of Professional Responsibility superseded the Canons of Professional Ethics (1937), which spoke of "conflicting interests" rather than "differing interests." The term was defined in Canon 6: "[A] lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." The ABA materials do not, of course, define the constitutional standard. However, they are consistent with *Glasser*'s emphasis on the interests of the defendants, and the corresponding duties owed by the attorney, rather than on the empirical question of the effect of the conflict on the attorney's performance. See Comment, Conflict of Interests in Multiple Representation of Criminal Co-defendants, 68 J. Crim. L. & C. 226 (1977).

There is a possibility of conflict, then, if the interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties. There is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action.

fected counsel's performance is not only unnecessary,[4] it is often an impossible task. As the Court emphasized in *Holloway*:

> "[I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing . . . . It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible." 435 U. S., at 490–491 (emphasis in original).

Accordingly, in *Holloway* we emphatically rejected the suggestion that a defendant must show prejudice in order to be entitled to relief. For the same reasons, it would usually be futile to attempt to determine how counsel's conduct would have been different if he had not been under conflicting duties.

In the present case Peruto's testimony, if credited by the court, would be sufficient to make out a case of ineffective assistance by reason of a conflict of interests under even a

---

[4] In *Glasser*, the defendant's objection at trial to joint representation was that, as his lawyer put it, "Mr. Glasser feels that if I would represent Mr. Kretske the jury would get an idea that they are together. . . ." 315 U. S., at 68. Whether the attorney's performance was in fact affected by the joint representation is, of course, irrelevant to the merits of such a claim. While the Court did discuss the possibility that the lawyer's failure to cross-examine prosecution witnesses fully or to object to the admission of certain evidence was the result of the joint representation, the possibility that the jury would assume that "birds of a feather flock to the same lawyer," Greer, *supra* n. 1, at 136, was the only objection raised at trial and the Court plainly considered it sufficient to require the appointment of separate counsel for Kretske.

restrictive reading of the Court's standard. In the usual case, however, we might expect the attorney to be unwilling to give such supportive testimony, thereby impugning his professional efforts. Moreover, in many cases the effects of the conflict on the attorney's performance will not be discernible from the record. It is plain to me, therefore, that in some instances the defendant will be able to show there was an actual, relevant conflict, but be unable to show that it changed his attorney's conduct.

It is possible that the standard articulated by the Court may not require a defendant to demonstrate that his attorney chose an action adverse to his interests because of a conflicting duty to another client. Arguably, if the attorney had to make decisions concerning his representation of the defendant under the constraint of inconsistent duties imposed by an actual conflict of interests, the adequacy of the representation was adversely affected. See *ante,* at 350 (defendant must show "that his counsel actively represented conflicting interests"). If that is the case, the Court's view and mine may not be so far apart after all.