**UNITED STATES of America**

v.

**Omar Ahmad Ali Abdel RAHMAN, et al., Defendants.**

**No. S3 93 Cr. 181 (MBM).**

United States District Court, S.D. New York.

Nov. 9, 1993.

---

Robert S. Khuzami, Andrew C. McCarthy, Asst. U.S. Attys., New York City, for U.S.

Ronald L. Kuby, William M. Kunstler, Kunstler & Kuby, New York City, for defendants Omar Ahmad Ali Abdel Rahman, Siddig Ibrahim Siddig Ali and Ibrahim A. El-Gabrowny.

## OPINION AND ORDER

MUKASEY, District Judge.

William M. Kunstler, Ronald L. Kuby and their law firm (collectively, the "Kunstler firm") now represent three defendants in this case—Omar Ahmad Ali Abdel Rahman, Siddig Ibrahim Siddig Ali and Ibrahim A. El-Gabrowny. In addition, the Kunstler firm represented defendant El Sayyid Nosair when he was tried in the courts of the State of New York in 1991 on charges growing out

of the murder of Meir Kahane and a subsequent assault, the same facts that underlie certain overt acts in Count One of the indictment, and Counts Five, Six, Eight, Nine and Ten. The government moves to disqualify the Kunstler firm from representing more than one defendant. It seeks also the imposition of certain prophylactic measures to assure that any client of the Kunstler firm understands his right to conflict-free representation, and that any former client of that firm understands the potential injury to his interest that could result from the disclosure of confidential information imparted to the Kunstler firm and nonetheless does not object to the Kunstler firm's representation of another client at trial.

The motion is granted for the reasons set forth below to the extent that the Kunstler firm will be permitted to represent either Abdel Rahman alone or El–Gabrowny and Siddig Ali together, on the terms set forth below, and is otherwise denied.

### I.

The history of this multiple representation, to the extent relevant, is as follows. El–Gabrowny was indicted initially in March 1993 in an indictment later superseded to charge several crimes in connection with an altercation between El–Gabrowny and a law enforcement officer seeking to execute a search warrant at that defendant's house in connection with the investigation into the bombing of the World Trade Center. The indictment charged also that El–Gabrowny possessed forged travel documents in the name of Nosair, who was then in a state prison, and Nosair's family. That case was scheduled to be tried beginning August 2, 1993.

On July 14, 1993 that indictment was superseded to include charges that El–Gabrowny and ten other defendants, including Siddig Ali, had participated in a conspiracy to bomb various buildings and other real property. At a conference the following day, after the Kunstler firm appeared for both El–Gabrowny and Siddig Ali, I said I would conduct a hearing at a later date to determine that both defendants understood their right to conflict-free representation, and that in aid of

such a determination I would appoint whichever attorneys from the panel of Criminal Justice Act ("CJA") attorneys were scheduled to receive cases that week, for the purpose of advising each defendant of that right independent of any advice received from the Kunstler firm. Kunstler objected, stating immediately in open court, without consulting either defendant, that, "[t]hey are perfectly willing to be represented here by me and they are here and they are willing to waive any alleged conflict of interest." (7/15/93 Tr. 17) He added that he did not want any CJA attorney "talking to either one of them." When I noted that neither defendant would be obligated to talk to independent counsel, but only to listen to an explanation of the risks of dual representation, Kunstler responded, "There are no risks here, Judge, except those created by the government." (*Id.* at 18)

Notwithstanding defense counsel's position, I appointed the two lawyers on duty to accept CJA appointment that day and a succeeding day to act as independent counsel to El–Gabrowny and Siddig Ali, to explain to them the hazards of joint representation, and to appear before the court on July 30, 1993 for a hearing pursuant to *United States v. Curcio,* 680 F.2d 881 and 694 F.2d 14 (2d Cir.1982). Before the hearing, both defendants conferred with Kunstler and Kuby in the jury room adjoining courtroom 219. At the hearing, both defendants appeared and responded to questions without a translator. Both CJA lawyers appeared and reported that they had explained to the two defendants their right to conflict-free representation. The lawyer who had given the explanation to El–Gabrowny reported he was satisfied that defendant understood his rights, although the lawyer who had met with Siddig Ali could report only that she had explained the rights in question but expressed no view as to the level of Siddig Ali's understanding. (7/30/93 Tr. 3) Siddig Ali himself acknowledged that counsel had explained a possible conflict to him, and that he had told her, "I have no problem with my attorney representing me and another defendant at the same time." However, when asked whether CJA counsel had given any examples of possible conflicts, his response was, "[n]ot in detail." (7/30/93 Tr. 4)

I then offered three examples to each defendant of possible conflicts of interest that could arise: (i) the offer of a plea arrangement to one defendant but not to the other, (ii) a trial strategy or argument or line of examination that would help one defendant but hurt the other, and (iii) the compromise of confidentially imparted information by a lawyer representing more than one client. Both Siddig Ali (*id.* at 4–9) and El–Gabrowny (*id.* at 10–14) said they understood the examples. Both defendants acknowledged that they had no questions about what had been explained. (*Id.* at 15, 16) At one point Siddig Ali gave what sounded like a rehearsed answer only marginally responsive to a question posed by the court:

> THE COURT: Understanding what I just explained, and after having consulted both with Mr. Kunstler and Mr. Kuby, and with Ms. Scolari [CJA counsel], do you want to continue in this case to be represented by Mr. Kunstler and Mr. Kuby?
>
> DEFENDANT SIDDIG ALI: Your Honor, I would like you to know that I conceive fully that I will be represented by Mr. Kuby and Mr. Kunstler and that will never put me in any conflict with my co-defendant or any other co-defendants, [b]ecause I believe that my co-defendant and myself are innocent people. My conflict is not with my co-defendant or with anybody else, but it is with the government, with the FBI, and with those people who are accusing me of doing things or saying things that I have not conspired or done.

(*Id.* at 16) This suggestion that claimed innocence overcame a potential for conflict would reappear later when Rahman, the third client of the Kunstler firm, made the same assertion at his *Curcio* hearing. *See* pp. 67, 68, *infra.* However, both defendants said they had understood the explanations of possible conflicts, and both expressed the desire to be represented by the Kunstler firm. (*Id.* at 16–17) The government and CJA counsel agreed that there were no additional questions that should be put to either defendant. (*Id.* at 9, 14)

On August 25, 1993, the grand jury returned a third superseding indictment adding four additional defendants including Rahman and Nosair. At arraignment the following day, Rahman was represented by Harry C. Batchelder, Jr., but by letter dated September 21, 1993 Batchelder informed the court that he could not reach a satisfactory fee arrangement with Rahman and would have to withdraw. By letter bearing the same date, Kunstler and Kuby informed the court that, "[f]or some time, persons acting on behalf of" Rahman had asked them to assume his representation, and that on the night of September 20, "the Sheik [Rahman] was able to reach Mr. Kuby at home, by telephone, and formally requested that we assume representation."

On September 24, 1993, I directed Batchelder to meet with Rahman "to advise him as to his right to conflict-free representation." (9/24/93 Mem. and Order) 1993 WL 385762 Kunstler and Kuby responded the same day, notifying the court that they had met with Rahman at Otisville the previous day and had "explained the concepts of conflict-of-interest and waivers thereof," with the result that Rahman "again repeated his desire for us to represent him," but adding that they had "no objection" to the order directing that Batchelder confer with Rahman.

At a *Curcio* hearing for Rahman on October 15, 1993, Batchelder reported that he had consulted with Rahman the day before, that Rahman wished to be represented by the Kunstler firm, that he had explained to Rahman his *Curcio* rights, and that Batchelder was "professionally comfortable with the fact that he understands his rights to independent representation." (10/15/93 Tr. 2) From the outset of the hearing, Rahman, who speaks no English and gave his answers through a translator, responded in a way that conveyed more adamancy in his choice of lawyers than understanding of the possible conflicts of interest inherent in that choice:

THE COURT: Now, there are many conflicts of interest that can arise when a lawyer represents more than one client in the same case. If you are one of the clients of a lawyer who represents someone else or other people in the same case,

those conflicts can hurt you and can wind up denying you the right to be represented by a lawyer who has only your interest at heart. Do you understand that?

DEFENDANT RAHMAN: I do know that very well. But I insist on having Mr. Kuby and Mr. Kunstler as my lawyers to defend me.

THE COURT: I am not questioning the degree of your sincerity. I am simply trying to establish your understanding of what it is that is at stake here. Do you also understand that when I say that the conflicts can hurt you, what I mean is that they could hurt you in a way that could result in your conviction. Do you understand that?

DEFENDANT RAHMAN: Well, my appreciation for your explanation, but I insist on my request.

(*Id.* at 6–7) Rahman then made a series of statements that throw substantial doubt on his ability either to understand or to acknowledge possible conflicts. Those statements included also an unresponsive claim of innocence of the same sort proffered by Siddig Ali at that defendant's *Curcio* hearing. When Rahman was asked to give his understanding of possible conflicts of interest, he responded as follows:

DEFENDANT RAHMAN: All I know is that I have nothing to do with this case other than that I am a cleric who prays in a mosque. I did not speak. I did not give orders. I have nothing to do with anything. And, *therefore,* there is no conflict of interest between me and any other co-defendant in this case.

(*Id.* at 8) (emphasis added) I then explained a possible conflict that could arise if Rahman had not attended an allegedly conspiratorial meeting but Siddig Ali or El–Gabrowny had. A lawyer representing Rahman alone might stress his absence from the meeting, even though to do so might prejudice at least by implication those who were there; a lawyer who represented both Rahman and a defendant who attended that hypothetical meeting might be reluctant to stress Rahman's absence for fear of injuring his other client, and in that reluctance deprive Rahman of a po-

tentially effective argument. Rahman responded as follows:

DEFENDANT RAHMAN: Your Honor, Judge, I have nothing to do with all of this.

. . . .

DEFENDANT RAHMAN: I am a cleric in the mosque whereas [sic] I speak my homilies to everyone here. There is no conflict of interest between me and any other defendant whatsoever.

(Id. at 9)

I then pointed out again, as I had earlier, that Rahman's alleged participation in the acts charged was different from any other defendant's. They are charged with doing and planning certain criminal acts, while he is charged with approving or directing those acts. That would free any lawyer representing him alone from the need to dispute evidence of what anyone did, and permit that lawyer to argue that regardless of what others may or may not have done, they did not act at his behest or with his approval. A lawyer representing both Rahman and others charged with doing or planning unlawful acts "would have a difficult time making that argument, because his defense of those other clients would require him to discuss evidence not only about whether you ordered or approved something illegal, but about whether his other clients did or planned something illegal. Do you understand that?" (Id. at 11) The following exchange then ensued:

DEFENDANT RAHMAN: I understand the example that his Honor has just given us. But I also understand from his Honor, from his words, that the nature of the alleged charges against me differ from the nature of the alleged charges against other defendants, and this proves in itself lack of conflict of interest.

THE COURT: Your position is that that establishes lack of conflict of interest?

DEFENDANT RAHMAN: Yes. I understand from the words of his Honor, the Judge, that the nature of the charges against me differ from the nature of the charges against other defendants. I feel that. I understand that, and I don't see any conflict of interest.

THE COURT: I don't want to press the logic of what you said before beyond what you intended, but I thought I understood you to say that you thought that that difference showed there was no conflict of interest. If that's what you mean, could you explain to me how it is that it shows no conflict of interest?

DEFENDANT RAHMAN: I am not a legal person, but this is my feeling.

(Id. at 11–12)

After that discussion, I reiterated that a lawyer who represents one defendant alone can adopt a trial strategy to help that defendant without worrying whether that strategy also hurts others, whereas a lawyer with more than one client would have to determine whether, in helping one client, he might be hurting another (id. at 13); that a lawyer representing Rahman alone would be obligated to maintain the confidentiality of anything Rahman told him, whereas a lawyer representing other clients might find it difficult to maintain such confidentiality (id. at 14); that Kunstler and Kuby had continuing professional obligations to Nosair that could limit their cross-examination of that defendant should he take the stand, and that Nosair had been quoted in the press as stating that Rahman had directed certain activity charged in the indictment (id.); that Rahman had the right to conflict-free counsel, and that if he chose to be represented by the Kunstler firm and then realized later he had made a mistake, he would not be allowed to change his mind and secure replacement counsel. Rahman stated without elaboration that he understood each of those points.

Batchelder, Kunstler and government counsel were then asked whether there was any additional question that should be put to Rahman, and each stated that he could propose none. (Id. at 17) Rahman himself said he had no questions to put to the court, and reiterated his desire to be represented by Kunstler and Kuby. (Id. at 17–18)

## II.

The government argues that no two of the defendants now represented by the Kunstler firm are similarly enough situated to permit joint representation, and that the firm should

be required to choose one client. The government points out the following potential conflicts: 1) that former client Nosair and El–Gabrowny were in jail during much of the time Siddig Ali is alleged to have been active in planning acts charged in the indictment, 2) that Siddig Ali has said on tape that he would not have proceeded in terrorist activity without Rahman's approval, 3) that El–Gabrowny was arrested in possession of forged passports bearing the photographs of Nosair and his family, and 4) that Siddig Ali claims to have been entrapped, while former client Nosair allegedly possessed information relating to bombs a year or more before any conspirator met the government's informant. The government suggests that even if the Kunstler firm represents only one defendant, it may be called on to attack the statements or testimony of a former client so as to defend properly the client it represents, and may face the further anomaly of having to avoid the use of information helpful to the client the firm represents at trial because that information was disclosed in confidence by a former client. These anomalies and cross-cutting interests, the government argues, call at the least for restricting the Kunstler firm's representation to one client, and other prophylactic measures.

The Kunstler firm argues that the government's hypothesized conflicts are overblown, and that defendants' choice of counsel should govern. In aid of its position, the firm presents a hypothetical opening statement, broad enough to embrace all defendants, that accuses the government of concocting this case to divert attention from its failure to prevent the World Trade Center bombing. By so arguing, the Kunstler firm would have the court conclude that because that firm can stitch together a one-size-fits-all defense, there can be no conflict sufficient to disqualify that firm from representing any defendant.

### III.

■ The relevant doctrinal source here is the Sixth Amendment's guarantee of the right to counsel, and the relevant major tributary is the line of cases that protect a defendant against ineffective assistance of counsel. Those cases hold that a defendant who identifies a possible conflict of interest must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984), but that actual prejudice is presumed when an actual conflict is shown that adversely affected a lawyer's performance. *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). "In the multiple representation context, an attorney has an actual, as opposed to a potential, conflict of interest when 'during the course of the representation, the defendants' interests ... diverge with respect to a material factual or legal issue or to a course of action.'" *United States v. Fulton,* 5 F.3d 605, 609 (2d Cir. 1993) quoting *Cuyler,* 446 U.S. at 356 n. 3, 100 S.Ct. at 1722 n. 3.

Rule 44(c), Fed.R.Crim.P., requires the court to advise each defendant jointly represented "of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel." The Rule does not define what "measures may be appropriate," but the Advisory Committee notes to the 1979 amendment adopting Rule 44(c) suggest two measures—knowing and intelligent waiver of the conflict, or an order that defendants be separately represented regardless of their preference.

In *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), the Supreme Court dealt with the appeal of one of three defendants who had been represented by the same lawyer in a narcotics case. The district judge directed that, notwithstanding the willingness of that defendant to be represented by that lawyer, separate representation would be required. At the time that direction was issued, it was apparent that each of the three had a different level of culpability, and one of the three had already pleaded guilty and was going to testify against the appellant. Moreover, the remaining defendant had been acquitted of some charges but faced additional charges, and appellant was a likely witness at his trial. 486 U.S. at 163–64, 108 S.Ct. at 1699–1700.

The Court was careful to point out the context in which dual representation issues arise:

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

486 U.S. at 162–63, 108 S.Ct. at 1699. Recognizing those difficulties, the Court recognized the need for wide trial court discretion, as follows:

> For these reasons we think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.

*Id.* at 163, 108 S.Ct. at 1699. The Court held that, "where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately repre-

sented." *Id.* at 162, 108 S.Ct. at 1698. It added that, "[t]he District Court must recognize a presumption in favor of [defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Id.* at 164, 108 S.Ct. at 1700.

Our Circuit has recognized that even when a constitutional defect exists, which would arise only when an actual conflict exists, "waiver by the accused of the conflict can conceivably alleviate the constitutional defect, so long as the representation by counsel does not seriously compromise the integrity of the judicial process." *United States v. Locascio,* 6 F.3d 924, 933–34 (2d Cir.1993).

■■■ On close examination, it appears that Rule 44(c) and the cases cited offer scant guidance for district courts in the exercise of the wide discretion *Wheat* affords, beyond directing that they apply a presumption in favor of counsel of choice (*Wheat*) and permitting but not requiring them to accept waivers of actual conflict unless to do so would seriously compromise the integrity of the judicial process (*Locascio*). These authorities define no easily articulated rule, and appear to require not only the weighing of interests neither precisely measurable nor easily compared (positively weighted value of defendants' choice balanced against integrity of the judicial process), but also the evaluation of relationships that are not now clear (how one defendant's interests compare with another's) and an augury of a future that cannot be certain (whether defendants will testify at trial and if so whether they will incriminate one another, whether cross-examination of a government witness will be aided by confidential information received from one defendant that would help another but perhaps injure the defendant who provided the information).[1] Nonetheless, the record in this case does disclose what appear to my eye to be *compelling reasons to require at a minimum that Rahman be separately represented.*

■■ At this stage, although Siddig Ali and El–Gabrowny are accused of performing different acts at different times, their situations

---

1. Both parties have cited cases in this Circuit antedating *Wheat* that offer additional guidance,

but cannot be read to establish current standards. Thus, the government recommends the

are similar in that both are accused of participating in the operational aspect of the alleged seditious conspiracy. Neither appears inclined to cooperate with the government. Although Siddig Ali's defense would appear at this stage to be entrapment, it appears also that he may well establish the inducement prong of that defense without testifying. *See Mathews v. United States*, 485 U.S. 58, 62–63, 108 S.Ct. 883, 886–87, 99 L.Ed.2d 54 (1988) (to establish entrapment, defendant must show government inducement and government must fail to show predisposition). If either of those defendants testifies at trial, it appears unlikely that he would incriminate the other. Nosair did not testify at his state court trial, *see N.Y. Times*, Dec. 23, 1991, at B8 col. 5, and there is now no particular reason to expect he would testify at trial in this case. Both Siddig Ali and El–Gabrowny speak English fluently. El–Gabrowny is not without experience in legal matters; he is Nosair's cousin, and defense counsel informed the court when he was first indicted that he was instrumental in organizing the Muslim community's support for Nosair and apparently attended the trial frequently. (See 4/1/93 Tr. 7) Both of these defendants appeared from their demeanor to understand their situation and to make an informed choice.

The same cannot be said of Rahman. He is not charged with any operational participation in the conspiracy. Rather, he is charged with counseling or approving the various acts performed or planned by others. His answers to questions posed at the *Curcio* hearing generate a serious doubt that he understands the nature of the conflict faced by a lawyer who represents him jointly with those charged with operational responsibility for the acts set forth in the indictment. Indeed, his statement that the difference between the nature of the charges against him and the nature of the charges against other defendants demonstrates the absence of conflict (see pp. 67–68 *supra*) could be taken itself as a sufficient reason for requiring that he be represented separately. Beyond that, he does not speak English and, not surprisingly, neither professes nor displays any familiarity with the usages that govern a proceeding such as this. As he pointed out at the *Curcio* hearing, "I am a cleric who prays in a mosque," (10/19/93 Tr. 8) and "I am not a legal person." (*Id.* at 12) The conflict between him on the one hand, and Siddig Ali and El–Gabrowny on the other, is plain and palpable; however intelligent or learned he may be, his waiver provides little assurance that it is based on even a rudimentary understanding of how that conflict can play out in a courtroom. My unease about the reliability of his waiver is enhanced rather than diminished by the Kunstler firm's blanket denial of all the conflicts that surround its position in this case.

■ The government has suggested further that standby counsel be appointed to conduct cross-examination of any former client of the Kunstler firm who takes the stand at trial, so as to minimize the risk that that client's privileged communications to the Kunstler firm will influence the cross-examination. That will be done.

Finally, the government has suggested that after the appointment of replacement counsel for Rahman or for Siddig Ali and El–Gabrowny, all former clients of the Kunstler firm should be solicited for their approval of that firm's representation of whichever client it continues to represent, and that if any former client objects, the firm should be disqualified. However, each of the former clients will have an independent lawyer, and

---

counsel of Judge Oakes's concurrence in *United States v. Mari*, 526 F.2d 117, 119–21 (2d Cir. 1975) recommending that joint representation should be very much the exception and not the rule—in essence a presumption against it, and the Kunstler firm counters with Judge Friendly's observation for the panel in *Curcio II*, that "[d]efendants who elect joint representation have decided that in their particular case its advantages outweigh its hazards," that they "have also committed themselves to one another, choosing to assume a common 'position before the law' [citation omitted]," and that although a judge may

find "woefully foolish" defendants' choice of joint representation "the thrust of *Faretta* [*v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (recognizing defendants' right of self-representation) ] is that the choice is mainly theirs; the judge, much less the prosecutor, is *not* to assume too paternalistic an attitude in protecting the defendant from himself." 694 F.2d at 25. In any event, the problems posed by self-representation are more tractable, because in general they are more foreseeable, than the problems posed by joint representation.

if any wish to proffer a reason why the Kunstler firm's continued representation of a different client would be improper, they can do so without judicial prompting. There is no reason to prolong and complicate this process still further by such a canvass.

In its opposition papers, the Kunstler firm has expressed its opposition to being put to a choice among its clients. That is entirely understandable. However, a choice must be made. Therefore, the Kunstler firm may reconsider its position and advise the court in writing by the close of business on November 15, 1993 as to whether it will represent Rahman or Siddig Ali and El–Gabrowny, failing which it will represent clients in the order in which it represented them from the outset. Which is to say, in default of a choice the firm will represent Siddig . Ali and El–Ga-browny. If the firm chooses to represent Rahman, and Siddig Ali and El–Gabrowny are eligible for appointed counsel, each will be represented by appointed counsel.

SO ORDERED.