**Glenn Earl MARTIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–85–160 CR.**

Court of Appeals of Texas, Beaumont.

Jan. 13, 1988.

Donald M. Brown, Morris, Brown & Davis, Conroe, for appellant.

Peter Speers, III, Dist. Atty., Conroe, for appellee.

OPINION

BURGESS, Justice.

Glenn Earl Martin was convicted of capital murder and was sentenced to life imprisonment in the Texas Department of Corrections. This occurred in July 1977. Martin filed a pro se notice of appeal, but this was four days beyond the time allowed to give notice of appeal. Martin then exhausted state habeas corpus remedies and began a legal journey through the federal courts. On July 18, 1984, the Fifth Circuit Court of Appeals affirmed the U.S. District Court's granting of an out-of-time appeal. *Martin v. Texas*, 737 F.2d 460 (5th Cir. 1984). Martin then refiled a pro se notice of appeal on June 4, 1985 and was appointed counsel on June 19, 1985. On September 6, 1985, this appointment was reaffirmed and the trial court entered an order providing appellant a free transcript and statement of facts. That same day the court made the following findings:

1) That Roger Russell, then Official Court Reporter for the 9th District Court, recorded the proceedings in the case by stenograph machine and audio tape recording.

2) The stenographic notes of the proceedings are missing in their entirety with no possibility of being located.

3) The audio tape recordings of the proceedings are audible and comprehensible, however they are incomplete. One tape containing portions of the voir dire examination is missing and not likely to be located. One tape containing a part of the testimony of the State's case in chief is missing and cannot likely be located.

4) As a consequence of the foregoing, it is not possible to produce a complete record of defendant's trial.

Thereafter, this court, in an unpublished opinion, *Martin v. State*, No. 09–85–160 CR (Tex.App.—Beaumont February 12, 1986), abated the appeal and ordered that the audio tape recordings be transcribed to determine if appellant's right of appeal could be fully protected. Subsequently, this court entered two additional orders concerning the filing of the statement of facts. On April 14, 1987, the last of twelve volumes of the transcript was filed with this court. Appellant now urges seven points of error. The first point of error concerns the status of the statement of facts and is dispositive of the appeal.

█ Under this point, appellant urges that a transcription of the audio recordings is not a transcription of the court reporter's official notes and therefore does not qualify as a statement of facts under the statutes and rules. We need not address that question since he also alleges that the transcription of the audio recordings is incomplete.

Appellant claims, and the state does not refute, that the statement of facts prepared from the audio tapes is deficient in the following manner:

a. the voir dire examination of twenty-eight members of the panel is missing;

b. the voir dire examination of four members of the jury is missing;

c. some unknown amount of the state's case in chief is missing.

The state, in its brief, says:

The State is painfully aware of the numerous Appellate Court decisions which hold that an Appellant who is deprived of a Statement of Facts on appeal without fault or lack of diligence on his part is entitled to a new trial. . . .

. . . .

In summary, it is the State's position, although based solely on notions of fundamental fairness—to the State—that granting a new trial because of the incomplete—not wholly missing—record is an inappropriately harsh remedy where the court reporter had every right in the world to destroy his notes. . . .

As recently as April 8, 1987, our court of criminal appeals has faced the question of an incomplete record. In *Dunn v. State*, 733 S.W.2d 212 (Tex.Crim.App.1987), the court stated:

[W]e have long held that the omission of a portion of the statement of facts from the record on appeal mandates reversal irrespective of whether the accused shows, *or even alleges*, that he suffered harm thereby.

*Id.* at 216 (emphasis theirs). The state argues that *Dunn* should be distinguished because it was a capital murder case in which the death penalty was imposed and further that it is not a case in which the reporter's notes were allowed to be destroyed under the then existing statute. Both of these arguments fail. There have been numerous cases less than the death penalty in which new trials were ordered because of the lack of a statement of facts. There have also been numerous cases where new trials were ordered because of the granting of an out-of-time appeal after the court reporter's notes had been destroyed. *Austell v. State*, 638 S.W.2d 888 (Tex.Crim.App.1982); *Ex parte Beck*, 621 S.W.2d 810 (Tex.Crim.App.1981); *Ex parte Garcia*, 548 S.W.2d 405 (Tex.Crim.App. 1977); *Ex parte Young*, 517 S.W.2d 288 (Tex.Crim.App.1974); *Ex parte Campbell*, 494 S.W.2d 842 (Tex.Crim.App.1973); *Ex parte Coleman*, 487 S.W.2d 119 (Tex.Crim. App.1972); *Ex parte Ramirez*, 483 S.W.2d 259 (Tex.Crim.App.1972); *Ex parte Perez*, 479 S.W.2d 283 (Tex.Crim.App.1972); *Ex parte Gaines*, 455 S.W.2d 210 (Tex.Crim. App.1970); *Ex parte Veasley*, 437 S.W.2d 857 (Tex.Crim.App.1969); *Ex parte Gray*, 437 S.W.2d 871 (Tex.Crim.App.1969).

Therefore, faced with the unassailable fact that the record before us is, at best, incomplete, we sustain point of error number one.

█ The dissent concludes that appellant waived his right to appeal. This is beside the point at this juncture. The Fifth Circuit Court of Appeals was aware of the question of waiver because it stated in its first opinion in this case, *Martin v. Texas*, 694 F.2d 423 (5th Cir.1982): "At the sentencing hearing, Martin's retained counsel

stated that he had discussed an appeal with his client and that Martin had 'no desire to make an appeal in this case'; no timely notice of appeal was filed." The Fifth Circuit then remanded the case to the district court for an evidentiary hearing on the issue of ineffective assistance of counsel. The Fifth Circuit later held that the failure of Martin's counsel to advise him of his right to court-appointed counsel if indigent amounted to ineffective assistance of counsel and, in view of the fact that he had not been advised of this right by the trial court, an out-of-time appeal should be granted. *Martin v. Texas*, 737 F.2d 460 (5th Cir. 1984). This waiver issue has been fully and fairly litigated in the other courts. In any event, the state did not raise the waiver issue before this court. The dissent details the jury charge and a portion of the jury's verdict. It also details many of the facts. Perhaps this is to show that appellant was convicted of a horrible crime and is a "continuing threat to society." This is also beside the point. We are called upon only to address the legal issues raised. We have done so. The judgment of the trial court is reversed and remanded for a new trial.

REVERSED AND REMANDED.

BROOKSHIRE, Justice, dissenting.

The record of the sentencing sets out that the following proceedings were had:
"THE COURT: Are you gentlemen ready for sentencing at this time?
"MR. KEESHAN: Yes, Your Honor.
"MR. REEVERS: Yes, sir, we are.
"THE COURT: You, Glenn Earl Martin, who was tried in this case, and the jury returned a verdict on the 28th day of June, 1977, convicting you of the offense of capital murder.
"The penalty having been assessed by the jury of life and it therefore be the order and the judgment of this Court that you be taken by the Sheriff of this county and kept until you can be conveyed to Huntsville, Texas, and there you will serve the punishment as set forth in the judgment of the jury which is for your natural life.

"MR. REEVES: I would like, *for the purposes of the record to explain to him that Mr. Martin waives his appeal.* I am not employed to represent him in that case and *this is after he has been fully informed of his rights that he will not pursue this case and he accepts this sentence and will make no appeal on it.* (Emphasis ours)
"THE COURT: Thank you, Mr. Reeves.
"(REPORTER'S NOTE: Hearing concluded at this time." (Emphasis ours)
A fair and realistic reading of the record clearly demonstrates that Mr. Martin waived his right of appeal and that he had been fully informed of his appellate rights. Also: "[T]hat he will not pursue this case and he accepts this sentence and will make no appeal on it."

In applying the law to the facts, the Court, at the guilt or innocence stage, charged the jury:

"VIII.

"Now, if you find from the evidence beyond a reasonable doubt that Glenn Earl Martin, acting together with other parties, Joseph Blaine Starvaggi, G.W. Green, and Ronald Earl Bayer entered into a conspiracy to commit the offense of burglary of the building of John C. Denson, as the term 'burglary' has been heretofore defined, and that pursuant thereto, they did carry out, or attempt to carry out, such conspiracy to commit the offense of burglary in that on or about the 19th day of November A.D. 1976, in Montgomery County, Texas, the Defendant, Glenn Earl Martin, Joseph Blaine Starvaggi, and G.W. Green did enter a building then and there occupied, controlled and in the possession of John C. Denson, the owner, without the effective consent of said owner and that the Defendant, at the time of such entry, if any, had the intent then and there to commit the offense of theft of personal property therein being, and that while in the course of committing or attempting to commit such burglary, as the term 'burglary' has been heretofore defined, Jo-

seph Blaine Starvaggi intentionally caused the death of John C. Denson, by shooting him with a gun, and that the Defendant, Glenn Earl Martin, pursuant to said conspiracy, if any, with the intent to promote and assist and aid Joseph Blaine Starvaggi in the commission of said burglary, then and there, at the time of the shooting, if any, was acting with and aiding the said Joseph Blaine Starvaggi in the execution or attempted execution of said burglary of the building of John C. Denson, if any, and that the shooting of John C. Denson followed in the execution of the conspiracy, if any, and in furtherance of the unlawful purpose, if any, of Glenn Earl Martin, Joseph Blaine Starvaggi, G.W. Green, and Ronald Earl Bayer, to commit the offense of burglary, and that the shooting of John C. Denson by Joseph Blaine Starvaggi, if there was such, was done in furtherance of the conspiracy to commit burglary, if any, and the burglary or attempt to commit burglary, if any, and was an offense that should have been anticipated as a result of the carrying out of the conspiracy, then you will find the Defendant, Glenn Earl Martin, guilty of capital murder.

"Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit Defendant, Glenn Earl Martin, of capital murder under the terms of the immediately preceding paragraph and find him not guilty, unless you find him guilty under the terms of Paragraph IX.

### IX.

"Now if you find from the evidence beyond a reasonable doubt that Glenn Earl Martin, Joseph Blaine Starvaggi, G.W. Green, and Ronald Earl Bayer, entered into a conspiracy to rob John C. Denson and that pursuant thereto, they did carry out, or attempt to carry out, such conspiracy to rob John C. Denson in that on or about the 19th day of November A.D. 1976 in Montgomery County, Texas, with intent to deprive John C. Denson, the owner, of personal property, to-wit, money and guns, without his ef-fective consent, Glenn Earl Martin and Joseph Blaine Starvaggi and G.W. Green did unlawfully appropriate from John C. Denson, or attempt to unlawfully appropriate from John C. Denson, said money and guns belonging to John C. Denson, and that Joseph Blaine Starvaggi, while in the course of committing such theft of money and guns from John C. Denson, and with intent to obtain or maintain control of said property, intentionally caused the death of John C. Denson, by shooting him with a gun, and that the Defendant, Glenn Earl Martin, pursuant to said conspiracy, if any, with the intent to promote and assist and aid Joseph Blaine Starvaggi in the commission of said robbery, then and there, at the time of the shooting, if any, was acting with and aiding the said Joseph Blaine Starvaggi in the execution or attempted execution of said robbery of John C. Denson, if any, and that the shooting of John C. Denson followed in the execution of the conspiracy, if any, and in furtherance of the unlawful purpose, if any, of Glenn Earl Martin, Joseph Blaine Starvaggi, G.W. Green, and Ronald Earl Bayer to rob John C. Denson of his money and guns, and that the shooting of John C. Denson by Joseph Blaine Starvaggi, if there was such, was done in furtherance of the conspiracy to rob, if any, and the robbery or attempt to rob, if any, and was an offense that should have been anticipated as a result of the carrying out of the conspiracy, then you will find the Defendant, Glenn Earl Martin, guilty of capital murder.

"Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit Defendant, Glenn Earl Martin, of capital murder under the terms of the immediately preceding paragraph and find him not guilty, unless you find him guilty under the terms of Paragraph VIII above."

The verdict of the jury is:

"We, the Jury, find the Defendant, GLENN EARL MARTIN, Guilty of Capital Murder, as charged in the indictment."

At the punishment stage, the jury, in substance, found unanimously and beyond a reasonable doubt that "Yes" was the correct answer to this Special Issue No. 2:

"Is there a probability that the Defendant, Glenn Earl Martin, would commit criminal acts of violence that would constitute a continuing threat to society?

"Answer

"We, the Jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is 'Yes'."

The verdict was signed by the foreman.

Under the record, and under the findings of the jury, and especially under the proceedings and sentencing, I think the Appellant did, in fact, waive his appeal and such waiver was an intelligent, knowledgeable decision. Appellant intentionally and knowingly waived his right to appeal. Appellant knew the entire record of the trial.

In the first Fifth Circuit opinion, in *Martin v. Texas*, 694 F.2d 423 (5th Cir.1982), the opinion recited, in substance, that, at the sentencing hearing, Martin's retained counsel stated that he had discussed an appeal with his client and that Martin had "no desire to make an appeal in this case" and, hence, no timely notice of appeal was made or filed. *Martin*, 694 F.2d at 423. Later, the Fifth Circuit recited that the denial of Martin's first state habeas corpus petition was affirmed, without a written order, by the Texas Court of Criminal Appeals. The same federal opinion points out that Martin, in a *later petition for habeas corpus* in the state court, claimed that neither his trial counsel nor the trial judge informed him of his right to appeal with a free appointed counsel and a free record if he was, in fact, indigent. Martin alleged that his own retained counsel's omission to so inform constituted ineffective assistance of counsel and, secondly, that the Sixth Amendment imposed a duty upon the trial judge to appraise him, independently, of his appeal rights, even if his counsel had advised him concerning the same. Again, the state petition that raised these issues was denied without written opinion. The Texas

Court of Criminal Appeals denied Martin's final state petition based upon its own reading of the sentencing record. The Court of Criminal Appeals held that Martin had abused the writ of habeas corpus. Then, the Fifth Circuit, in its first *Martin, supra,* opinion, said that, because the alleged claim of *ineffective assistance of counsel had not been refuted by the record,* Martin must be given a chance to prove them. Hence, the Fifth Circuit remanded the cause to the United States District Court for the purpose of conducting an evidentiary hearing. In the Federal District Court, Martin made the following averments in his own petition for writ of habeas corpus:

1. That Martin had been represented by retained counsel at his trial.

2. That retained counsel, after the verdict of conviction, informed Martin that an appeal would be fruitless [and it seems clear to us that that decision would have to be judged at the time it was made].

3. That the retained counsel had advised Martin that he, Martin, might receive the death penalty at a later trial if he did make an appeal of his conviction.

4. Martin also alleged that, at the time of his sentencing, he did not know that he could pursue a direct appeal without any costs or free of cost. [This allegation was lately brought.]

Yet, in a footnote, the Fifth Circuit wrote that a waiver of a fundamental constitutional safeguard, such as his right to appeal, with retained counsel or free court-appointed counsel, could be brought about by:

"[A]n intentional relinquishment or abandonment of a *known* right or privilege." (Emphasis theirs)

Concluding:

"Thus, the waiver and ineffective assistance issues each turn in part upon the fact of Martin's knowledge...."

Our Court's opinion seems offended by the fact that, in this dissent, the crucial details of the court's jury charge and the jury findings and verdict are set out, speculating that this is to show that the Appellant was convicted of a horrible crime and

is a continuing threat to society. No offense should be taken. This dissent is to show that Martin, who was present during all of his trial, had made an intelligent and intentional relinquishment or abandonment of his known right of appeal. That was a legal test pronounced by the Fifth Circuit Court of Appeals' opinion in *Martin v. Texas, supra.* It certainly seems unnecessary, if not sophistry, to require a district judge to instruct Appellant, about his appellate rights if it was clear from the record that the accused had no desire to appeal the case at the time of the sentencing. I think the record shows that the Appellant really did not want an appeal because of the death penalty staring him in the face for a second time.

Indeed, in the second Fifth Circuit case of *Martin v. State of Texas,* 737 F.2d 460, at page 461, the Federal Court points out Reeves (Martin's retained attorney) testified that he (Reeves) *considered an appeal dangerous because he felt that the State of Texas would join in asking for a new trial in order to get a second chance at having the death penalty assessed against Martin.* Reeves clearly advised Martin not to appeal and also told Martin that he, Reeves, would not undertake to represent the Appellant on appeal since Reeves thought that the appeal would result in exposing Martin to the death penalty. This was the paramount consideration—not whether an appeal would be free. The Fifth Circuit agreed that, at the time this advice was given, the double jeopardy question involved had simply not been resolved. At the federal evidentiary hearing, *Martin, himself, testified that his counsel advised him not to appeal because of the threat of receiving the death penalty upon the retrial.* Again, this was the paramount consideration and, with prudence, Martin waived his appeal at sentencing. Nevertheless, on Martin's testimony that he had not been told of his right to appointed counsel on appeal, if indigent, by either his attorney or the trial judge, an out-of-time appeal was granted by the Fifth Circuit Court. Then, the Fifth Circuit Court's second opinion reads in this somewhat contradictory manner:

"Finding that Martin was denied effective assistance of counsel in this regard, and that he was not informed of this right by the trial judge, we affirm the district court's granting of an out-of-time appeal.[1] We do not find it necessary to the disposition of this case to decide the issue of the trial court's duty to inform convicted defendants of the right to appeal with appointed counsel if indigent. "1. In so holding we do not state that counsel's failure to advise his client of the right to appeal with court-appointed counsel will always result in a finding of ineffectiveness. We hold as we do since, in this case, neither Martin's trial counsel *nor* the district court informed him of this right. Furthermore, the undisputed evidence shows that Reeves knew of Martin's indigency." (Emphasis theirs)

On this point, the Federal District Court opined that, because the Appellant, Martin, did not indicate to his retained counsel that he, Martin, wanted to appeal after his retained counsel advised him against doing so, any further duty that his attorney had to advise him of his right to appeal free of any cost was extinguished. The Federal District Court did hold, however, that error occurred *when the State trial judge failed to advise Martin of his right to appeal free of cost if indigent,* citing *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). I think it is settled law that the test of deciding ineffective assistance of counsel is determined by reviewing the whole record and deciding the issue as of the time the trial attorney acted. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Although the United States District Court had an evidentiary hearing of sorts, it is obvious that it had none of the record of the main trial, on the merits, in the State district court.

To obtain a reversal based upon ineffective assistance of counsel, an Appellant must satisfy the two-prong test enunciated in *Strickland, supra.* First, the Appellant must show that counsel's performance was deficient, i.e., that his assistance was not "reasonably effective." Second, once the

accused has made such a showing, he must show that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Ingham v. State,* 679 S.W.2d 503 (Tex.Crim.App.1984). The adequacy of the attorney's representation must be gauged by the totality of the representation. *Romo v. State,* 631 S.W.2d 504 (Tex.Crim.App.1982). The right to counsel is not interpreted to mean errorless counsel nor is it counsel judged ineffective by hindsight. *Ex parte Carillo,* 687 S.W.2d 320 (Tex.Crim.App.1985). In determining whether there was ineffective assistance of counsel, the trial as a whole must be looked at, *not isolated incidents of counsel's performance. Moore v. State,* 694 S.W.2d 528 (Tex.Crim.App.1985). Therefore, an accused must show that the totality of counsel's representation was actually deficient and that counsel's failures were of such magnitude that the accused was deprived of the right to a fair trial. *See Strickland, supra.*

I see nothing in either of the federal decisions that prohibits us from drawing the conclusion that Martin, intentionally, knowingly and intelligently, waived his right to appeal after a review of the virtually complete record of the State court trial on the merits. Such record has been obtained after strenuous efforts. Nor do I see anything in either of the two Circuit Court holdings that conclusively requires the reviewing appellate State Court to hold that Ray Reeves was an ineffective counsel. In fact, I conclude he was not.

Bearing in mind that this court's majority has reversed the case on *one ground of error only,* the court cites, with special emphasis, *Dunn v. State,* 733 S.W.2d 212 (Tex.Crim.App.1987). It is interesting to note that, in *Dunn, supra,* the court wrote, at page 215:

> "To be entitled to a reversal of judgment of conviction *where the statement of facts is not filed,* an appellant must show *due diligence in requesting it* and that failure to file or to have the *statement of facts timely filed is not in any way due to negligence, laches, or other fault* on the part of the appellant and his counsel...." (Emphasis added)

But the Federal Court's mandating of an out-of-time appeal is based solely on ineffective assistance of counsel. Further, in *Dunn,* the court specifically held and concluded that the *appellant, Dunn, exercised due diligence in attempting to secure a complete statement of facts.* That is simply not our case, here, with Appellant Martin. *See Timmons v. State,* 586 S.W.2d 509 (Tex.Crim.App.1979).

It certainly seems a fair comment to say that our own Texas Court of Criminal Appeals has passed on this very situation, in this case subjudice, at least twice in the past. And, too, in the *Dunn, supra,* case the court wrote, at page 216:

> "Moreover, because this *is a death penalty case,*
>
> "'[w]e may not shirk our duty to review 'the entire record'* [Article 37.-071(h)] ... That this Court have before it the *entire record in a capital case serves a public policy which considers assuring evenhanded imposition of the ultimate penalty....'* " (Emphasis added)

*See McGee v. State,* 711 S.W.2d 257, 260 (Tex.Cr.App.1986) (Clinton, J., concurring).

In *Dunn,* the court further wrote, at page 216:

> "Thus, over forty years ago, this Court reversed the *murder conviction of a death sentenced* defendant because he had 'been deprived, *without fault or negligence on his part, of a statement of facts* and bill of exception'...." (Emphasis added)

Needless to say, the death penalty was not imposed against Martin, although it could have been upon a retrial. And Reeves knew it and Martin knew it too. Nor do I shirk from pointing out that the out-of-time appeal is mandated by the Fifth Circuit on one ground and our majority opinion is based entirely on another ground.

The trial counsel for Appellant was Honorable Ray Reeves. He diligently presented a Motion to Suppress any statement made by Appellant. During the Motion to Suppress, Mr. Reeves vigorously and artfully cross-examined one Forrest Simpson,

a peace officer, concerning the suppression of any statement made by the Appellant. He also questioned Simpson's actions and observances in relation to Wesley Stiles and Billy Colson, who were also law enforcement officers. He also brought to the stand Elton Matthews, who was the stepfather of the Appellant, as well as Earl Martin, the father of Glenn, and Glenn Earl Martin, himself. The hearing on the Motion to Suppress Glenn's oral statements was conducted with outstanding advocacy and in depth.

A Motion for Continuance was also presented.

There can be no doubt but that the Appellant's trial counsel conducted a thorough and professional voir dire examination, which was very much in detail, on point and quite lengthy and effective.

The mother of the accused was placed on the stand on the Motion to Suppress. This was Christine Matthews. It concerned whether or not she had ever received a phone call from the officers during the time that the oral statement was given. Other witnesses were examined and called to the stand by the Appellant's trial lawyer, at the Motion to Suppress. The defense also presented a Motion for Mistrial.

The case on the merits was carefully tried. During the case in chief, Reeves certainly vigorously attacked the admissibility of the Appellant's oral statements. The oral statements did lead to the recovery of certain rifles and pistols, which were taken from the victim's home. There was an M–1 carbine taken from the Denson home, the serial number of which matched the recovered rifle. There was a Smith & Wesson .38 pistol, the serial number matching, taken from the desk and home of Denson, that was recovered, subsequent to and as a result of the oral statement. These various weapons were recovered from the backwaters of the San Jacinto River and they were pointed out to officers by the Appellant. And it seems clear that there was a written confession that was given by the Appellant that was not introduced into evidence.

The deceased, one John C. Denson, had been a juvenile probation officer and had also worked as an undercover person. The Appellant's lawyer, at trial, tried to also portray him, Denson, as a drug dealer. The carbine rifle, also described as an Alpine Carbine Rifle, was attempted to have been sold by the Appellant and another for $85 at a nightclub. The State was able to prove, or certainly raise, very strongly, the fact that the paint on the car used in the escape and the paint on the garage of Denson were the same or very similar.

It is correct that we do not have an entirely complete or perfect record before us, but, of course, Reeves, the attorney, the trial judge and the Appellant, himself, heard the whole of the evidence adduced at trial.

The oral confession was presented to the jury through witness, Wesley Stiles, identified as a Texas Ranger. Reeves, at this point, did all he could to protect the Appellant's rights concerning the same. He took the position that the oral statement did not comply with *TEX.CODE CRIM.PROC. ANN. Art. 15.17* (Vernon 1977) and *Art. 38.22* (Vernon 1979). The witness, Stiles, referring to the Appellant, placed before the jury a portion of the oral confession as follows:

"He told me on the afternoon of November 19, 1976, that a white male by the name of Shadow who was later identified as Ronald L. Earl Beyer and G.W. Green and Joey Starvaggi that there was a place located north of Tomball, Texas that had some guns and some money that they could probably get."

Stiles said that Glenn said the group left an apartment on West 34th Street, in Houston, in a white and maroon 1969 model Buick belonging to G.W. Green's brother and proceeded to this house pointed out to them by Ronald Beyer.

Glenn said the group pulled up to the house, and sat in the car for a few minutes before anyone went to the door. Then, Joey Starvaggi and G.W. Green went to the door. Glenn and Beyer sat outside in the car for a little while. Beyer and Glenn heard a shot and Glenn ran to the front

door and as he opened the door he saw Joey Starvaggi bringing a little girl and Mrs. Denson downstairs and Joey Starvaggi told him, Glenn, to tie them up, which Glenn did. Then, two more shots went off. Glenn said that Joey fired these two shots into the body of John C. Denson.

Then Glenn ransacked the house and ran upstairs and tore open a metal box and gathered up guns and ammunition. He walked to the garage and motioned to Ronald Beyer to get the car out of the garage and they checked around the house again and loaded the guns and ammunition into the trunk of the car. Then Glenn got in the back seat of the car and the group returned to Houston, from whence they came. Mr. Reeves renewed his objection to the oral confession, which was overruled. Clearly this deadly criminal escapade was planned and premeditated.

After the group arrived back in Houston, Glenn and Joey Starvaggi went to the Fountain Club located off Interstate 45, north of Houston, and contacted a person there that Glenn had gone to high school with and sold to him the chrome-plated carbine rifle, identified as an Alpine Carbine Rifle, for $85.

Then, later, on or about November 20, 1976, Glenn and Joey returned to the Fountain Club and found the person who had bought the rifle. Glenn wanted it back. They told the purchaser that he, Glenn, could not stand the heat because the crime involved the murder of a peace officer. The buyer of the gun then gave the gun back to Glenn. Glenn and Joey then returned back to the apartment and on November 21, 1976, Glenn and G.W. Green drove out east on Interstate 10 towards Baytown and threw two rifles and a pistol into the backwaters of the San Jacinto River. One of the motivations for this disposal of the guns was that, after the occurrence, Glenn and others had read or heard that the man shot and killed in Magnolia, Texas, was a police officer of some sort.

In cross-examination, Mr. Reeves showed, by Officer Stiles, that during these oral statements Glenn had told Stiles that he, Glenn, did not know that there was going to be a shooting and that Glenn said he did not have a weapon and, further, that Glenn said he had not done any of the shooting.

Reeves tried to establish, by Stiles, that Glenn had said that he had heard two more shots after he, Glenn, had gotten through tying up the young girl and Mrs. Denson. And, at Glenn's insistence, there was not to be any more shooting and that there would not be any shooting of the woman, Mrs. Denson, or the young girl. Stiles replied that he did not remember Glenn's having made such statements.

Susan Denson, the girl, took the stand. She and her mother, Mrs. Denson, were upstairs watching television at about 8:00 o'clock p.m. and, sometime after that time, they heard a disturbance begin. Susan was forcefully brought downstairs and made to lie in front of the television set. She heard some of the intruders talking behind her. She heard two men talking behind her. She could not remember exactly what they said but she could definitely hear them talking and it seemed like one of them was saying "kill 'em, kill 'em, aren't you going to kill 'em?" Apparently, this conversation was taking place one with the other. Later, Susan heard one of the voices say: "I killed your old man". Susan admitted that she did not know who the later voice belonged to but she said it was a different voice from that of the bearded man, who had come up the stairs to get her and her mother. Hence, the logical deduction, or reasonable inference, is that Appellant had said either "I killed your old man" or the Appellant had said "kill 'em, kill 'em, aren't you going to kill 'em?"

Later in the record, *it is shown by a witness, called by the defense,* that Glenn Martin and a person known as "Joey" were together in the Fountain Club Lounge within a reasonably short time after the killing of the deceased. The witness testified that Martin offered to sell him some weapons and that, on that occasion, the witness knew that Martin had quit his job and that Martin was "messing up." This witness, Danny Lutz, testified that he had a real fond or real close relationship with Glenn

Martin and that he, Lutz, felt kindly towards Martin.

Also, Mr. Reeves brought several witnesses to the stand in an effort to show that the oral statements of Martin were inadmissible. However, these witnesses did not turn out to be helpful or favorable to the Appellant.

This writer has a better understanding now of why, during the time diligent efforts were made to obtain the record in this case for appellate review, the Appellant sent to this court a copy of a Petition for Writ of Mandamus purporting to show the original thereof was to be filed in the United States District Court for the Southern District of Texas, Houston Division, in a case styled *Glenn Earl Martin, Appellant v. State of Texas, Appellee,* case No. H–79–1614. This petition was an attempt to mandate an opinion of this Ninth Court while additional volumes of the Statement of Facts were being filed. Appellant prayed, inter alia, for a mandated order of vindication within 30 days.

While the original of the petition for mandamus was never filed in the United States District Court, Houston Division, so far as we know, there was yet another action for writ of mandamus filed in the Twelfth Court of Appeals at Tyler.

The record—obtained after much effort—consists of one Transcript of 85 pages and Statements of Fact, Volumes 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 14. These 14 volumes amount to over 2021 pages. After reading this lengthy record, I am of the opinion that Glenn Earl Martin, intelligently, knowingly, intentionally and prudently waived his right of appeal in view of the fact that, under this entire record, if an appeal had been taken and a new trial granted, he could have received the death penalty at the hands of another jury.

In the interest of judicial economy and comity, I would respectfully suggest that the Fifth Circuit Court could have obtained the record in the case subjudice to determine if Reeves was an ineffective counsel for Martin. Certainly, a careful reading and review of the lengthy record, I submit, would be the superior method to determine

Reeves' effectiveness as an advocate rather than considering only the brief proceedings at the sentencing. I would argue for this method of determining the right to an out-of-time appeal even though the Fifth Circuit, in the second Martin case, *Martin v. State,* 737 F.2d 460, 462 (5th Cir.1984) wrote:

"It is settled law in this circuit that the failure of counsel to advise a defendant of his right to appointed counsel on appeal if indigent amounts to ineffective assistance of counsel. [citations omitted]...."

By way of constructive criticism, I submit this rule is not sound even under federal decisional law. *See Strickland, supra.*

Further, I would make the same argument and take the same position in respect to the duty of the State district court to inform a convicted accused, as was Martin, of his right to appeal, if indigent, with a free record and a court-appointed counsel.

There is a glaring, crucial hiatus in the history of this litigation in that our Ninth Court of Appeals does not direct a new trial on the basis of ineffective counsel, which was the sole ground for the granting of the out-of-time appeal by the Fifth Circuit.

The very brief summary of the record above demonstrates, I think, the wisdom of Reeves' advice to Martin and the prudence of Martin's action in waiving his appeal. Moreover, the capsule summary undergirds my criticism of the rules set out in the two *Martin* cases, *supra,* in the Fifth Circuit.

I think this dissent meets the standards for publication under *TEX.R.APP.P. 90(c)* in that the same criticizes existing law and involves a legal issue of continuing public interest.

Hence, I respectfully dissent.