**UNITED STATES of America, Plaintiff,**

v.

**Samuel C. STOIA, Defendant.**

**No. 87–Cr–155.**

United States District Court,
E.D. Wisconsin.

May 31, 1995.

Paul Kanter, Asst. U.S. Atty., Milwaukee, WI, for plaintiff.

Rhonda Anderson, Miami, FL, for defendant.

### *ORDER*

TERENCE T. EVANS, Chief Judge.

Samuel Stoia was one of thirty-seven defendants originally charged in this 1987 case with multiple counts relating to a conspiracy to import and distribute marijuana. Although several multidefendant trials were heard by different juries (cases were tried in

1988 and 1989) Stoia was tried alone on the four counts he faced in 1990. At his trial, he was represented by attorneys Vincent Flynn of Miami and Ronald Walters of Chicago. Another attorney, David Wolfson of Miami, also made appearances on Mr. Stoia's behalf during various stages of the case. Mr. Wolfson was present during the trial, but he did not sit at counsel's table with Stoia and attorneys Flynn and Walters.

A little background about Mr. Stoia is useful in putting the present issue in this case into its proper perspective. In 1976, Mr. Stoia was convicted of conspiracy to possess cocaine with intent to distribute in the United States District Court for the Southern District of Florida. That case began when two of Stoia's codefendants were arrested after landing a private plane carrying cocaine at the Palm Beach International Airport in Florida. Stoia received a 2-year prison sentence from this conviction. The custodial component of the sentence was satisfied and Mr. Stoia was released on parole. Stoia did not do well on parole as he left south Florida without permission, and a warrant for his arrest as a parole violator was issued. Subsequently, in 1979, Stoia was caught flying an airplane without permission in Venezuela. According to the record in this case, the plane he was flying was prepared for a drug smuggling operation. The seats of the plane had been removed, and it carried 230 gallons of extra fuel. After Stoia's return to the United States—via deportation from Venezuela—he finished a brief period in custody. He was released again to parole supervision in 1980.

In the mid–1980's, the Roubas–Kelly (the name given to the wide-ranging drug conspiracy in this case) pharmacological concern was looking for a pilot to fly planeloads of marijuana from Jamaica to a drop site in the Caribbean. Glen Deppe, a long-time smuggling associate of Mr. Stoia, recommended Stoia to the organization for the job. Stoia, who was an experienced pilot with his own plane, was retained. Stoia then engaged in smuggling activities using his plane, and those activities resulted in his 1987 indictment in this case.

Following the 1987 indictment, an attorney retained by Mr. Stoia made arrangements to have Stoia surrender to authorities. Stoia, however, had different ideas. He didn't want to surrender. He went on the lam instead. Stoia eventually was arrested in Hawaii, traveling under a false name, in the fall of 1989. Stoia's arrest came too late for him to be joined in the trial of his codefendants, and that earned him a favored position as a sole defendant in the trial that was conducted in this court in March of 1990.

After a 4–day trial, a jury found Stoia guilty of conspiracy to distribute and conspiracy to import marijuana. He was found not guilty of two substantive counts of importation of marijuana. I sentenced Stoia to 17 years concurrent on each of the two counts. Stoia filed a notice of appeal of his conviction, but it was voluntarily dismissed. Subsequently, in 1992, I granted Stoia's rule 35(b) motion and reduced his sentence to 10 years imprisonment concurrent on each count. He received favorable treatment on his rule 35 motion because he gave information to the government about his drug activities.

Six years after the indictment and 3 years after his trial, Mr. Stoia filed a 28 U.S.C. § 2255 petition, alleging that he was denied the effective assistance of counsel because one of his attorneys (not actual trial attorneys Flynn or Walters) had a conflict of interest that affected his performance. Stoia alleged that a fourth attorney (Flynn, Walters, and Wolfson make three), Raymond Takiff of Miami, whom he also paid to defend him, had an actual conflict of interest because he previously entered into a plea agreement with federal prosecutors in Florida whereby he agreed not to "represent individuals charged with crimes under investigation by the United States Attorney's Office [or] any federal law enforcement authority...." Takiff, it turns out, was in hot water in Florida—he was facing probable indictment on tax charges—and his 1989 plea agreement was an attempt to gain some sort of advantage for himself by cooperating with the government in an investigation of state judges who were allegedly taking bribes.

I denied Stoia's section 2255 petition without holding an evidentiary hearing. I deter-

mined that, even if Stoia had not waived his claim, his sixth amendment rights had not been violated because Takiff was not his counsel of record AT ANY TIME during court proceedings in this case. Stoia appealed, and the Court of Appeals for the Seventh Circuit vacated my order and remanded the case for an evidentiary hearing on Stoia's claim. *Stoia v. United States*, 22 F.3d 766 (7th Cir.1994). The court of appeals held that

> [a]n attorney's constitutional ineffectiveness can manifest itself at trial even though the attorney never appears in court.

The court went on to cite examples. It said:

> For example, a defendant may hire more than one attorney to work on his criminal case, but only one of them may actually enter an appearance and represent him in court. If a non-appearing attorney is burdened by a conflict of interest, the conflict may, nonetheless, adversely impact the defendant's trial because of that attorney's ability to influence how the defendant's trial attorney conducts the case. Also, an attorney hired to do "behind the scenes" work may, through deficient performance, negatively impact the trial counsel's ability to give the defendant an adequate defense.

This sort of circumstance—"a defendant may hire more than one attorney to work on his criminal case"—may well be of great benefit to the affluent defendant. If O.J. Simpson, for instance, gets convicted despite the efforts of the bevy of lawyers who have appeared (or will appear by the time the case is over) for him, he will have a claim of ineffective assistance of counsel if yet another attorney—with a conflict of interest—who never entered an appearance in court was, nevertheless, retained to give advice which controlled some aspect of the trial. Under the reasoning of *Stoia*, were it to apply in California, Judge Ito would be required to hold an evidentiary hearing on a claim of ineffective assistance of counsel.

Even though I admire the care the *Stoia* court took to protect Mr. Stoia's rights, I have a concern because the rule it announces in his case only inures to the benefit of affluent defendants, not to the vast majority of defendants who pass through the courts.

In both federal and state courts, most defendants make do with court-appointed attorneys. And they only get one, at least only one at a time. These defendants will not have occasion to obtain a postconviction hearing regarding a "behind-the-scenes" attorney who may have given bum advice. They will not get a chance to have a second kick at the cat. Another concern I have is that if the attorney with the alleged conflict never appears in court, the trial judge can do nothing to protect the case from direct or collateral attack on appeal. This is an unusual situation, to say the very least.

I believe that great care should be taken in determining whether the standards necessary for the resolution of the issues raised in Mr. Stoia's petition are met. The court of appeals directed that an evidentiary hearing be held on the issue. Pursuant to that directive, a full hearing was held. The hearing involved testimony from Flynn, Wolfson, Stoia, and Special Agent Larry Kaiser of the Criminal Investigation Division of the IRS. The hearing generated a 224–page transcript. I have carefully reviewed the evidence presented to evaluate whether the standards for relief have been met.

The court of appeals has set forth the standards it believes are necessary for the resolution of the issue raised in Mr. Stoia's petition. Stoia must establish that Takiff acted under "an actual conflict of interest [which] adversely affected his ... performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). The court went on to state that

> *Cuyler* requires a showing of *both* "an actual conflict of interest" and an adverse effect on the lawyer's performance. If the defendant can satisfy both prongs of the *Cuyler* test, then "prejudice is presumed."
> ...
>
> An actual conflict of interest results if "the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests." An "adverse effect" occurs when an attorney's actual conflict of interest causes a "lapse in representation contrary to the defendant's interests...."

... An adverse effect occurs, if, but for the attorney's actual conflict of interest, there is "a [reasonable] likelihood that counsel's performance somehow would have been different.

*Stoia,* 22 F.3d at 770–71 (citations omitted).

Mr. Stoia's case is puzzling because his situation is unique. I have been unable to find any cases even remotely similar to what we have here. A more typical conflict of interest situation is presented in *Cuyler* itself. In *Cuyler,* three defendants charged with first degree murder were represented throughout state proceedings by two privately retained attorneys. Funds for the lawyers were secured by friends of the three defendants, but no part of the fee came from defendant Sullivan or his family. Sullivan was tried first and convicted. The other two defendants were acquitted in separate trials. In rejecting relief for Sullivan based on the record before it, the Supreme Court announced the rule—in order to demonstrate a violation of his sixth amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance—that I work with today. But as I read *Cuyler,* it seems that the court is only concerned about what the defense attorney who appeared for the defendant did or did not do. I don't think *Cuyler* contemplated a situation like the one we have here. But I'll pass that point and move to Stoia's claim in light of *Cuyler* as directed by our court of appeals.

The law on attorney conflicts of interest originally developed in situations like the one present in *Cuyler*—one attorney represented more than one defendant. The conflict presents itself when the attorney sacrifices the interest of one defendant for another. *See Dently v. Lane,* 665 F.2d 113, 117 (7th Cir. 1981). The law on conflicts eventually expanded to situations where a single defendant and his attorney allegedly had diverse interests. *Cerro v. United States,* 872 F.2d 780 (7th Cir.1989), was such a case.

In *Cerro,* the defendant was convicted by a jury in 1984 on various drug charges. He filed a section 2255 petition in 1988, arguing that he was denied his sixth amendment right to the effective assistance of counsel because James Ewers,[1] his trial and direct appeal attorney, had a conflict of interest which affected his performance. Cerro claimed, among other things, that Ewers himself was dealing cocaine and that he did not vigorously cross-examine a government witness for fear of exposing his own criminal conduct. The court found no actual conflict of interest and denied the petition. Stoia's general claim here is more like the claim in *Cerro*—in that he alleges that Takiff was protecting himself—but different because unlike attorney Ewers in *Cerro,* Takiff did next to nothing on Stoia's behalf. Now to Stoia's claim.

■ The first question is, did Takiff have an actual conflict of interest? In support of a "yes" answer, Stoia argues several points. First, he says that had Takiff vigorously represented him, the government WOULD have discovered a breach of his plea agreement with the prosecutors in the Southern District of Florida which WOULD have resulted in consequences detrimental to Takiff. Second, he claims that Takiff forbade the interviewing of witnesses to avoid disclosure of his alleged participation in obstruction of justice and subornation of perjury in the 1989 trial of Adolf Horace Altuve. Mr. Altuve was one of the thirty-seven defendants in this case. Takiff represented Mr. Altuve during his trial and Altuve was acquitted, a circumstance that made Takiff appear to be a good addition to the Stoia defense team. In fact, Wolfson states in his affidavit that Stoia specifically wanted Takiff on his side because he beat the government in the Altuve case. Lastly, Stoia now says that had Takiff appeared at his trial, "an inquiry would have resulted into the potential conflict the existence of the perjurious testimony created." These propositions are not supported by the record.

Prior to the March 1990 trial date and after Takiff signed his plea agreement, Stoia and/or his agents were in possession of at

---

**1.** Just a few weeks ago, on May 9, 1995, the Court of Appeals for the Seventh Circuit affirmed Ewers' conviction on a 1994 indictment charging him with distributing cocaine through his Madison, Wisconsin, law office. *United States v. Ewers,* 54 F.3d 419 (7th Cir.1995).

least four documents evidencing Takiff's representation of Stoia: a letter outlining the agreement, two cancelled checks, and a retained agreement from Takiff. Indeed, Stoia had personally required the written retainer agreement because he distrusted lawyers and wanted documentation for future recourse.

Thus, Takiff had already provided documentary proof of a possible violation of his plea agreement. Given what he had done, there could be no reasonable expectation on Takiff's part that his personal security would be better protected by failing to follow through in the representation of Stoia. Indeed, an equally likely scenario was just the opposite—that his retainer would become known by his failure to appear at trial.

Similarly, there is no evidence to suggest a conclusion that Takiff forbade witness interviews TO AVOID disclosure of his involvement in prior criminal activity. Rather, Takiff and Flynn agree that the potential witnesses were not consistent with the defense theory and strategy. Further, the responsibility to present a defense (which may, but may not include interviewing witnesses) was an obligation imposed upon each attorney. It is not reasonable to conclude that Takiff would assume that the other attorneys in the case would not fulfill duties they thought necessary.

Most importantly, however, there is no factual support for the proposition that "witness interviews" would have disclosed any criminal conduct by Takiff. Attorney Wolfson, whose primary responsibility was to interview witnesses, testified at the hearing that not one of the defense witnesses he interviewed either before or after trial disclosed evidence of Takiff's criminal activity. Stoia discovered, fortuitously to be sure, the possible obstruction/perjury allegation against Takiff only AFTER he was incarcerated with Michael Morrison, a person HE DID NOT previously know. Stoia's incarceration with Morrison was subsequent to his conviction in this case. Thus, pretrial interviews of potential Stoia defense "witnesses" would not have revealed alleged criminal conduct by Takiff. Similarly, Takiff's appearance before this court at Stoia's trial would not have resulted in questions about his involvement in obstruction of justice or perjury at Mr. Altuve's trial.

■ The record does not, therefore, support the existence of an actual conflict of interest. However, even assuming the existence of such a conflict, Stoia's petition must be dismissed because there is no support for a causal connection between any conflict and an adverse effect. Any discussion of actual conflict and adverse effect is necessarily intertwined, but the two-prong test of *Cuyler* must nonetheless be satisfied. There is no causal connection between an assumed conflict and not interviewing witnesses, for the witnesses to be interviewed would not have jeopardized Takiff. As Special Agent Kaiser testified during the hearing, there were five potential witnesses to the allegation (and it was only an allegation) that Takiff was involved in an obstruction of justice or suborned perjury in the Altuve case. They were Frank McConnell, James and Edward Rodriguez, Altuve himself, and his wife Brenda. That's it. None of these five have a connection with Sam Stoia. By no stretch of the imagination could they be considered potential defense witnesses *for* Stoia. The claimed "failure to interview witnesses" for "fear" of unearthing Takiff's own problems is nothing more than a rather iridescent red herring.

Mr. Stoia also claims that Takiff failed to file pretrial motions, persuasively argued for an unwise adjournment of the trial, caused Stoia not to testify in his own behalf, and undermined Stoia's confidence in attorney Flynn. And, of course, Takiff did not participate in the trial. I find that there is no causal connection, however, between an assumed conflict of interest and any of these identified effects. Flynn testified that while he would have been pleased to receive additional pretrial motions, he was not aware of any viable basis for any motions beyond those which he filed. As the judge who presided over all of the proceedings in this massive case, I take judicial notice of the fact that no motions—except for severance—did anything for any of the defendants in the case. And Stoia, in effect, got severance without asking for it. His fugitive status got

him away from his codefendants and into a trial by himself.

The claim regarding an adjournment of the trial also has nothing to do with the "adverse effect" prong of *Cuyler*. The facts are not in dispute. The case was originally set for trial to begin on December 8, 1989. Attorney Flynn asked to have it moved and it was—to January 28, 1990. Stoia claims that Takiff urged Flynn to seek another adjournment. Another adjournment was granted, and the trial was moved 5 weeks, to March 7, 1990. The government's case against Stoia got better because Deppe was arrested and agreed to testify against Stoia near the end of February of 1990. But what does this prove? The answer is, nothing. When trial dates are changed, three things can happen. Most often, the strength (or weakness) of a case remains the same. Sometimes, however, cases get stronger or weaker with time. That either of the latter options occur, however, is fortuitous. There are, we know, some elements of luck in these things. If, instead of Deppe surfacing, primary witness Charles Lackey had died—or contracted amnesia, or like some cooperators changed his story—the Takiff adjournment suggestion would have won accolades from Stoia. He probably would have sent Takiff another check for his good advice.

The "advice not to testify" claim suffers from the same deficiency. Flynn says he advised Stoia to testify, while Takiff advised him not to testify. Stoia, it is claimed, took Takiff's advice. The advice that Stoia stay off the stand was at least equally meritorious. If Stoia had testified, the jury probably would have learned that he had a prior drug trafficking conviction involving an airplane. They probably would have also learned that he was flying a drug plane in Venezuela in 1979 and that he was arrested in Hawaii, as a fugitive, living under a false name in 1989. These revelations could very well have doomed his credibility. Keeping Stoia off the witness stand was certainly a sound strategy.

As to the claim that Stoia's confidence in Flynn was undermined, that's the risk one takes, it seems to me, by choosing to have several defense lawyers in a case. If one lawyer, by word or deed, strikes a defendant

as "better" or "more aggressive" than another, well, that's a break of the game. It doesn't mean, as *Cuyler* requires, that an adverse effect on the lawyer's performance is present.

Lastly, Takiff's failure to appear at the trial does not, at this point, entitle Stoia to relief. When it became known that he was not going to be in on the trial (Takiff said he was sick), Stoia and his other attorneys did nothing to seek a continuance or otherwise enforce the retainer contract with Takiff; they never brought his involvement in the case to my attention. I find that they waived this issue by not calling the situation to my attention. And furthermore, it cannot be concluded that Takiff's actions as to Stoia were designed to protect himself. Takiff may have acted badly, but it had nothing to do with a conflict of interest.

It is also interesting to note that Takiff's nonappearance at the trial should have come as no great surprise. Takiff's October 27, 1989, letter to Wolfson was a harbinger. The letter, an attachment to Vincent Flynn's affidavit, was written by Takiff to Wolfson after Takiff had been approached to join the Stoia team. In responding to an apparent Wolfson suggestion that Takiff participate in the trial, Takiff wrote,

> It is impossible for me to warrant, guarantee or otherwise promise to enter a formal appearance and take an active role in this case. In fact, I think such an event would be a disservice to your client. I have known Vinnie Flynn for years. We have tried cases together on various occasions and I think the world of him! It is impossible, however, for both he and I to properly represent the same man. (A banjo act should never follow a banjo act.) In addition to this fact any jury would immediately look at your client and wonder that he could afford TWO Miami lawyers.

Anyone who fairly reads Takiff's letter to Wolfson would quickly realize that smooth sailing does not lie ahead.

In the final analysis, it seems that Stoia valued Takiff's advice because he found Takiff to be impressive. That was Stoia's mistake. He paid for four lawyers, and one of them was a charlatan. Takiff didn't perform

as advertised (apparently as advertised by Takiff himself), but it had nothing to do with a conflict of interest, potential or actual. And it may well be that Takiff affected the other members of the defense team and that Stoia followed Takiff's advice over advice from his other lawyers. But Stoia was free to accept and follow advice from any of the lawyers he paid to defend him. Whatever the effect that Takiff had on the defense, there is no evidence to support a causal connection between that effect and any presumed conflict.

Lastly, there just is no way that one can fairly view this case and determine that Sam Stoia was denied his sixth amendment right to counsel. In fact, he received better lawyering than most defendants get. At every step of the proceedings against him—from arraignment through sentencing—he had Vincent Flynn at his side. Flynn was a more than competent defense lawyer. His folksy approach to the case probably accounts for the 50–50 verdict, two "not guiltys" to go with two "guilty" verdicts. In addition, Stoia had Walters at his side during the trial and Wolfson at his beck and call. Their activities in the case underscore the finding that Stoia had more than adequate legal talent at his disposal. All in all, Mr. Stoia has failed to satisfy the *Cuyler* test, and therefore his petition is DENIED.

SO ORDERED.