STATE of Wisconsin, Plaintiff-Respondent,†

v.

Jesus C. VILLARREAL, Defendant-Appellant.

Court of Appeals

*No. 2011AP998–CR. Submitted on briefs May 18, 2012.
—Decided February 21, 2013.*

2013 WI App 33

(Also reported in 828 N.W.2d 866.)

† Petition for Review denied 6-14-13.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Joseph L. Sommers*, Oregon.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Daniel J. O'Brien*, assistant attorney general, and J.B. Van Hollen, attorney general.

Before Lundsten, P.J., Sherman and Reilly, JJ.

¶ 1. SHERMAN, J. Jesus C. Villarreal appeals a judgment of conviction for four counts of incest with a child and a subsequent order denying his motion for postconviction relief. Villarreal asserts five separate grounds upon appeal, including a claim that his trial attorney provided ineffective assistance of counsel due to an actual conflict of interest that adversely affected counsel's performance. Because we agree with Villar-

real that an actual conflict of interest adversely affected his trial counsel's performance, we reverse on that basis and, consequently, do not reach the other issues raised.

## BACKGROUND

¶ 2. This case has a lengthy history. In March 2007, Villarreal was charged with four counts of incest with his biological daughter. The charges stemmed from sexual contacts that were alleged to have occurred between Villarreal and his daughter in 1996 and 1997, starting when the girl was sixteen years old. The case was tried to a jury in December 2008 and resulted in a hung jury and mistrial. During the 2008 trial, Villarreal's sister, Sara Villarreal, testified as a defense witness. The substance of her testimony, as relevant to this appeal, will be recounted later in this opinion.

¶ 3. Villarreal was tried a second time in June 2009. Villarreal's second trial resulted in a conviction on all four counts. Sara testified once again for the defense.

¶ 4. Prior to the second trial, Sara was accused of committing perjury during the first trial by the investigating officer in Villarreal's case. The attorney who represented Villarreal in both trials, Ronald Benavides, suggested that he should represent Sara in the perjury investigation. Sara agreed to engage Benavides as her attorney and paid him to do so.

¶ 5. After the second trial, Villarreal filed a motion for postconviction relief requesting a new trial. Villarreal claimed, in part, that he was denied effective assistance of counsel because of Benavides's conflict of interest arising from his dual representation of Villarreal and Sara. It was uncontested that Villarreal did not object and there was no attempt to obtain a waiver or

693

other form of informed consent for the dual representation. As the prosecutor stated at the postconviction hearing:

> [W]e all agree that there was no signed written waiver; that [Attorney Benavides] was indeed representing those two individuals. I think that there is an agreement that there was no substantial conversation with either the defendant or Sara that we're aware of in regard to a conflict of interest. There was clearly no waiver on the record in court.

¶ 6. The circuit court denied Villarreal's motion for a new trial. The court determined that there was no actual conflict of interest negatively affecting Benavides's representation of Villarreal. The court stated: "I do not find that Benavides took any action for the purpose of advancing Sara Villarreal's interest over Jesus Villarreal's interests." Villarreal appeals. Additional facts will be discussed below as necessary.

## DISCUSSION

*Standard of Review*

¶ 7. Our review of a defendant's claim that he or she was denied effective assistance of counsel due to counsel's conflict of interest presents a mixed question of fact and law. *State v. Love*, 227 Wis. 2d 60, 67, 594 N.W.2d 806 (1999). We will not overturn a circuit court's factual findings regarding the circumstances of the case and counsel's conduct and strategy unless those findings are clearly erroneous. *Id.* However, whether the facts establish a constitutional violation is a question of law which we review de novo. *Id.*

*Analysis*

¶ 8. Following his conviction, but not before, Villarreal alleged that he was denied effective assistance of counsel because his trial counsel, Benavides, represented conflicting interests and the conflict had an adverse effect on Benavides's performance.[1] When a defendant has not raised an objection at trial to an

---

[1] The analysis here is that which the Wisconsin Supreme Court has held to be appropriate to a situation where a new trial is sought in a postconviction motion where, as here, no objection to the dual representation was made at trial. *See State v. Love*, 227 Wis. 2d 60, 82, 594 N.W.2d 806 (1999). As the circuit court correctly concluded, this analysis is not directly based upon the Rules of Professional Conduct, SCR ch. 20. *See id.*, at 80–82.

However, the supreme court has articulated a set of standards and procedures to be utilized by a circuit court that is made aware of dual representation in determining whether to disqualify the attorney from participating in the case at the circuit court level. *See id.* at 81. The standard to be applied in that situation is the standard established in the Rules of Professional Conduct. *See id.* at 79–81. *See also* SCR 20:1.7.

The conflict, at least in some cases, can be waived. The supreme court has mandated that any waiver by the defendant of the dual representation "should be formalized on the record so that it can be evaluated by the court and so that it will not later serve as a basis for post-conviction relief." *Love*, 227 Wis. 2d at 79–81. In addition, the general rule is that "a defendant who validly waives his right to conflict-free representation also waives the right to claim ineffective assistance of counsel based on the conflict." *State v. Demmerly*, 2006 WI App 181, ¶¶ 16–18, 296 Wis. 2d 153, 722 N.W.2d 585 (setting forth the general rule and explaining why there may be some circumstances in which a defendant should be permitted to bring an ineffective assistance claim based on a conflict of interest, even when the defendant has waived the conflict).

attorney's potential conflict of interest, the mere *possibility* of a conflict is not sufficient to establish a constitutional violation. *Id.* at 68. In such situations, to establish a constitutional violation the defendant must show that " 'an actual conflict of interest adversely affected his lawyer's performance.' " *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)).

¶ 9. In this context, Wisconsin courts sometimes use the term "actual conflict" or "actual conflict of interest" as shorthand for the requirement that a defendant must show that a conflict of interest adversely affected his or her attorney's performance. Our supreme court in *Love* wrote:

> In order to establish a Sixth Amendment violation on the basis of a conflict of interest, a defendant who did not raise an objection at trial must demonstrate by clear and convincing evidence that his or her counsel had an actual conflict of interest. Determining what constitutes an actual conflict of interest must be resolved by looking at the facts of the case. *An actual conflict of interest exists when the defendant's attorney was actively representing a conflicting interest, so that the attorney's performance was adversely affected.*

*Id.* at 71 (emphasis added). The court in *Love* further explained:

> [I]n a post-conviction motion when no timely objection was made, "actual conflict of interest" cannot be neatly

---

Villarreal has not raised an issue as to whether the circuit court's failure to make the inquiry mandated by the supreme court in *State v. Kaye*, 106 Wis. 2d 1, 14, 315 N.W.2d 337 (1982), constitutes error. Indeed, the parties do not discuss when the circuit court was first apprised of the dual representation. Accordingly, we do not address the question. *See State v. Allen*, 2004 WI 106, ¶ 26 n.8, 274 Wis. 2d 568, 682 N.W.2d 433.

separated from performance, for it is difficult to draw a line between potential conflict and actual conflict without pointing to some deficiency in the attorney's performance either in what was done or in what was not done. Moreover, it is not satisfactory to condemn relationships which are labeled as "actual conflicts of interest," then disregard them when they do not have any discernible effect on the case.

*Id.* at 71–72 (quoted sources omitted).

¶ 10. The "effect" that a defendant needs to show should not be confused with the normal ineffective assistance requirement of showing prejudice. In this context, the required "effect" is an effect on the attorney's performance, not a possible effect on the outcome of the proceeding. If a defendant demonstrates an actual conflict of interest that adversely affects his or her attorney's performance, prejudice is presumed. *Id.* at 71. "Counsel is considered *per se* ineffective once an actual conflict of interest [adversely affecting counsel's performance] has been shown." *Id.* A defendant need not "prove that some kind of specific adverse effect or harm resulted from [the] conflict." *State v. Kaye,* 106 Wis. 2d 1, 8–9, 315 N.W.2d 337 (1982).[2]

---

[2] The State appears to advance an interpretation of the "adverse effect" test that conflicts with controlling law. In a paragraph in its appellate brief, arguing that the prosecutor wrongly conceded that the requisite "adverse effect" is present here, the State argues that neither Villarreal nor Sara was sufficiently affected by the dual representation because: "The same result would have occurred if another attorney (or no attorney) represented Sara at the interview or, conversely, if another attorney represented Villarreal at his second trial." This appears to be the functional equivalent of an argument rejected in *Kaye,* 106 Wis. 2d 1. The court in *Kaye* wrote:

¶ 11. Thus, the question here is whether Villarreal made a showing by clear and convincing evidence that Benavides was actively representing conflicting interests and, as a result, his representation of Villarreal was adversely affected. Accordingly, we turn our attention to the facts that Villarreal asserts make this showing.

¶ 12. The testimony of Sara Villarreal was a key part of Villarreal's defense at his first trial. Sara supplied motive evidence explaining why the alleged victim would falsely accuse Villarreal. Sara alleged that the victim told a non-sibling relative that, if they accused parents of sexually or emotionally abusing them, they could get money from the government. The following is the relevant portion of Sara's testimony at the first trial:

Q. Now, was there an occasion in February of 2006 where you were present with [the victim] and [female relative 1] where [the victim] was making a statement about getting a kind of benefit if one would accuse her father of sexual assault?

[objection, discussion and ruling omitted]

A. Yes. I was present there.

Q. When was that?

We do not interpret ["actual conflict of interest adversely affected his lawyer's performance"] as meaning that a defendant must first show an actual conflict and then prove that some kind of specific adverse effect or harm resulted from this conflict. This would be logically inconsistent with the rule in [*Cuyler v. Sullivan*, 446 U.S. 335 (1980)] and previous supreme court cases that a defendant need not demonstrate prejudice in order to obtain relief. *Therefore, we disagree with the State's argument in the present case that a defendant must prove that his attorney's performance would have been different if he had only represented one of the defendants.*

*Id.* at 8–9 (internal citation omitted; emphasis added).

A. It was in February of 2006.

Q. Where was that?

A. It was at [the victim]'s apartment.

Q. And what was the occasion?

A. [The victim], [female relative 1] and [female relative 2] were all going to go out partying.

Q. Where were you all gonna go?

A. To the bars.

Q. And what was the specific statement?

A. I was playing with the baby and they were getting dressed, and I overheard that [the victim] said to [female relative 1] *you know if we accuse our parents of ah, sexual or emotional problems, we can get money from the Social Security Administration.*

Q. What was your reaction—again, not what did you say—what was your reaction.

A. I was stunned. I couldn't believe that they were talking like that.

Q. Not asking what you said, did you confront her with that; in other words, did you let her know what your reaction was?

A. Yeah, they saw the reaction in my face.

Q. At that point, what happened?

A. She went *Oh, but we would never do that of course.*

¶ 13. There is no dispute that it was important to Villarreal that Sara testify at the second trial consistently with the above testimony at the first trial. The

problem we address here arose because, following Villarreal's first trial, an investigating officer accused Sara of having given perjured testimony. This investigation prompted Benavides to suggest that he should represent both Villarreal and his sister Sara. Subsequently, the investigating officer sought to question Sara, and Benavides advised Sara to meet with the officer. The meeting took place, with Benavides attending, five months prior to Villarreal's second trial.

¶ 14. We agree with Villarreal that, when the investigating officer asked to question Sara as part of an investigation into whether Sara committed perjury at Villarreal's first trial, and Benavides advised her to meet with the officer, Benavides had an actual conflict of interest that adversely affected his representation of Villarreal.

¶ 15. To the extent that Sara was motivated to protect her brother and, thus, wanted to testify consistently with her statements at the first trial, Sara's and Villarreal's interests may have been aligned. However, when Sara learned that she was being investigated for committing perjury at the first trial, her interest was potentially at odds with Villarreal's interest. Villarreal's interest was in having Sara testify consistently at the second trial. Sara's interest was in not being successfully prosecuted for perjury.

¶ 16. The potential for a conflict of interest was transformed to an actual conflict of interest that adversely affected Benavides's representation when Benavides advised Sara to cooperate and be interviewed by the investigator who had accused her of perjury. We agree with the concession the prosecutor made before the circuit court. The prosecutor aptly explained:

700

The mere act of [Sara] giving another statement to the police adversely affected [Villarreal] as it potentially gave the State more to cross-examine [Sara] about at the second trial.

¶ 17. Whether Sara had perjured herself during the first trial or not, advising Sara to cooperate and be interviewed by the investigator appears to have been in Sara's interest. If Sara was telling the truth, the interview gave her an opportunity to convince the investigator that she should not be charged with perjury. If Sara was not telling the truth, cooperating with the interview was at worst a calculated risk that she could avoid perjury charges by being cooperative. However, although participating in an interview with the investigator was in Sara's interest, it was not in Villarreal's interest.

¶ 18. Every time a witness tells his or her story, it provides an opportunity for there to be variations in that witness's assertions. According to Sara's testimony, the conversation she overheard between the victim and female relative 1 regarding obtaining government benefits if they accused their parents of sexual or emotional abuse took place in February 2006. Sara testified at the first trial on December 10, 2008. The interview involving Benavides took place on January 14, 2009. Sara then testified at Villarreal's second trial on June 24, 2009. Whether Sara was telling the truth or not, there was likely to be differences each time she told her story, especially in light of the fact that the final telling of the story took place nearly a year and a half after the alleged conversation was overheard.

¶ 19. Thus, from Villarreal's perspective, the interview with the police officer had no significant upside and a serious potential downside because of the likelihood that it would produce additional inconsistent

statements that could be used to impeach Sara at a second trial. It is hard to imagine that a lawyer only concerned with Villarreal's interests would have advised a witness to submit to a police interview between the two trials.[3]

¶ 20. The State focuses on Benavides's actions with respect to topics where Sara's and Villarreal's interests were aligned and the extent to which Benavides succeeded in pursuing their best interests simultaneously. But the question here is not the extent to which Benavides succeeded in representing both of their interests. Rather, the question is whether there came a time when Sara's and Villarreal's interests diverged and Benavides took an action that adversely affected his representation of Villarreal. As we have explained, that occurred when Benavides advised Sara to agree to a police interview between the two trials.

¶ 21. Although Villarreal is not required to show resulting prejudice, we note that the police interview did have a negative effect on Sara's credibility at the second trial. The interview produced an additional discrepancy when, contrary to her testimony at the first

---

[3] Although the State does not make the argument, we acknowledge that Sara's cooperation had one possible, albeit minor, beneficial effect for Villarreal. A common strategy when cross-examining a witness is asking the witness whether they agreed to speak with counsel or an investigator prior to trial. If the witness says no, the opposing side can argue that the refusal to cooperate shows bias. Thus, by agreeing to be interviewed, the prosecutor here could not attempt to impeach Sara by pointing out that she had declined to be interviewed by an investigating officer prior to the second trial. However, we think this is not a significant benefit because Sara did agree to be interviewed prior to the first trial and, of course, she testified at the first trial. It is difficult to believe that a jury would give significant weight to her refusal to be interviewed a second time under these circumstances.

trial, Sara asserted during the interview that she told an investigator prior to the first trial about the alleged motive statement by the victim to her relative. This was significant because the value of Sara's testimony hinged on the jury believing that the conversation she over-heard actually occurred. Her additional inconsistency on this topic further undermined her credibility and was highlighted by the prosecutor during his closing argument.[4]

¶ 22. In sum, we conclude that, while there argu-ably was a reason in Sara's interest for Benavides to advise Sara to cooperate with the interview request, it

---

[4] An additional incident occurred that is worth noting. During cross-examination, the prosecutor was attempting to draw Sara's attention to a 2007 interview with police prior to the first trial. Sara misunderstood and made a reference to the later perjury interview:

Q. And [the investigator] told you that she was calling you to gather information in this investigation; correct?

A. No.

Q. That's not correct?

A. No. She told me that she had to question me about this, about me lying under perjury.

MS. JAY: Objection; your Honor.

THE COURT: I'm going to move to strike. You can disregard that statement.

No motion for mistrial was made at the time and this exchange has not been raised as a ground for new trial on this appeal, although it was discussed by the circuit court in its decision on the postconviction motion. Thus, while this is not itself an issue in this appeal, it does demonstrate yet another pitfall, from Villarreal's point of view, of advising Sara to cooperate with the interview request. Despite the curative instruction, this stumble in Sara's testimony might have further undermined her credibility.

was decidedly against Villarreal's interest for Benavides to advise Sara to be interviewed. It follows that Villarreal has shown that he was denied effective assistance of counsel because his trial counsel represented conflicting interests, resulting in an actual conflict that had an adverse effect on counsel's performance.

¶ 23. Having concluded that Villarreal is entitled to a new trial on the basis of his counsel's conflict of interest, it is not necessary for us to decide the other issues raised by Villarreal, namely, the three other instances of ineffective assistance claimed by Villarreal or the allegations of prosecutorial misconduct. *See Turner v. Taylor,* 2003 WI App 256, ¶ 1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (when a decision on one issue is dispositive, we will not reach other issues).

## CONCLUSION

¶ 24. For the reasons stated above, we reverse and remand for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded for further proceedings.

¶ 25. LUNDSTEN, P.J. *(concurring).* The majority opinion correctly recites and applies governing law. More specifically, the majority properly applies the law summarized in *State v. Love,* 227 Wis. 2d 60, 594 N.W.2d 806 (1999), and *State v. Kaye,* 106 Wis. 2d 1, 315 N.W.2d 337 (1982), both of which follow, as they must in this Sixth Amendment context, the United States Supreme Court's decision in *Cuyler v. Sullivan,* 446 U.S. 335 (1980). These cases instruct that reversal is required if a defendant can show that an actual conflict of interest adversely affected his or her counsel's performance. I write separately to question whether this test makes

704

sense when the identified conflict of interest has no effect on the fairness of the trial or other proceeding at issue.

¶ 26. My focus here is on the law, not on the facts of this particular case. The other two judges on this panel may not share my view that, in this case, we can be confident that Attorney Benavides's actual conflict of interest, and resulting adversely affected performance, did not affect the fairness of Villarreal's trial. There is, however, no reason to flesh out this possible dispute because, under controlling law, it is not relevant. As the majority aptly summarizes, when a defendant demonstrates an actual conflict of interest that adversely affects his or her attorney's performance, prejudice is presumed. Majority, ¶ 10. But does it make sense to completely ignore prejudice if a defendant has been provided an entirely fair trial? Does it make sense to give no consideration whatsoever to whether the identified problem with counsel's performance possibly harmed the defendant?

¶ 27. To put a finer point on my concern, consider the following hypotheticals based on the case at hand. Suppose facts that track those here up until the start of Sara's interview with the police investigator following Villarreal's first trial. But then suppose that the interview was uneventful and that the subject of the interview never came up at Villarreal's second trial. In this scenario, the effect on Villarreal is exactly zero. But, under governing law, reversal is required because Attorney Benavides's performance was adversely affected with respect to Villarreal when he advised Sara to cooperate with the investigator and submit to the interview, advice that the majority explains was potentially harmful to Villarreal.

705

¶ 28. Compare my first hypothetical scenario with a second in which the facts are the same, except there is no request to interview Sara. That is, suppose facts that track those here, except that, after Attorney Benavides commences representing Sara with respect to a possible perjury charge, there is no interview request and the potential conflict between Sara's interest and Villarreal's interest never evolves into an actual conflict. In this second scenario, Villarreal's conviction would stand.

¶ 29. In both of my hypothetical scenarios, the fairness of the subsequent trials is completely unaffected. Indeed, the trials are exactly the same. Does it make sense that reversal is required in the first scenario, but not in the second?

¶ 30. Now compare my first "reversal" scenario with the statement in *Love* that, at the postconviction stage, we should be concerned with real deficiencies and real problems:

> In a post-conviction motion, the institutional factors are different. If a defendant has received a fair trial, the court has an institutional interest in protecting the finality of its judgment. Moreover, theoretical imperfections and potential problems ought not be treated more seriously than real deficiencies and real problems, for such skewed values would undermine public confidence in the administration of justice.

*Love*, 227 Wis. 2d at 82. In my view, what we have in my first scenario is a potential problem, not a real one.

¶ 31. I do not here propose a different test. It would be no easy task and, before doing so, I would want adversarial briefing and considerably more time with the large and complicated body of state and federal case law on this topic. Moreover, so far as I can tell, if I

have identified a problem that can be fixed, our state supreme court is not at liberty to fix it. Still, maybe there is some value in pointing out that the law we are required to apply is at least potentially problematic.

¶ 32. Before closing, I offer two additional observations.

¶ 33. First, if the law we follow today sometimes produces needless reversals that benefit no one, I suspect those instances are rare. Typical multiple representation cases involve the simultaneous representation of codefendants, not a defendant and a key defense witness.[1] In the far more common situation involving the dual representation of codefendants, circuit courts are required to either obtain knowing waivers or forbid the dual representation. *See Kaye*, 106 Wis. 2d at 14 ("To avoid such problems in the future, we will require trial courts to conduct an inquiry whenever the same attorney or law firm represents more than one defendant in the same criminal case."). And, while it might be common for a defense attorney to have some influence over a defense witness with ties to a defendant, I suspect it is highly unusual for that attorney to actually represent a defense witness, as occurred here.

¶ 34. Second, there is one competing interest I want to acknowledge: deterrence. Reversing a conviction, when so far as I can tell the defendant has received a fair trial and the jury has reached the correct verdict, is a drastic remedy. If this drastic remedy gains the

---

[1] The State does not argue that the fact that the dual representation here involves a defendant and a key defense witness, rather than codefendants, means that we should or may apply a different analysis than the one specified in *State v. Love*, 227 Wis. 2d 60, 594 N.W.2d 806 (1999). In this respect, I simply note that, if there is anything to be made of this distinction, there was no attempt to do so here.

attention of prosecutors, defense attorneys, and judges, and serves to heighten their vigilance for possible conflicts of interest, that is a good thing. Some number of defendants will receive the undivided loyalty of their attorneys and needless reversals will be avoided.

¶ 35. Accordingly, I join the majority opinion in full, with the exception of ¶ 21, and related footnote 4, suggesting that Attorney Benavides's adversely affected performance may have had an effect on the outcome of the trial.